730 F.2d 1128
 12 Bankr.Ct.Dec. 11, Bankr. L. Rep. P 69,796
 In re FLIGHT TRANSPORTATION CORPORATION SECURITIES LITIGATION.
Drexel Burnham LAMBERT Incorporated and Moseley, Hallgarten,
Estabrook & Weeden, Inc., on behalf of themselves
and all others similarly situated, Appellants,
v.
FLIGHT TRANSPORTATION CORPORATION, FTC Executive Air
Charter, Inc., FTC Cayman, Ltd., and William
Rubin, Appellees,
Putnam High Yield Trust, United High Income Fund, Inc.,
Opperheimer High Yield Fund; Continental Illinois Nat'l
Bank & Trust Co. of Chicago, Greyhound Leasing, & Norwest
Bank Minneapolis, N.A., Norwest Bank Calhoun-Isles, N.A.,
and named plaintiffs in the action of Frank P. Antinore, et
al., Intervenors.
In re FLIGHT TRANSPORTATION CORPORATION SECURITIES LITIGATION.
Appeal of FOX & COMPANY.
In re FLIGHT TRANSPORTATION CORPORATION SECURITIES LITIGATION.
Appeal of Jack ADAMS, Jr., Ezell Jones, Russell T. Lund,
Jr., Wardwell M. Montgomery, Delbert Oldenburg,
Marjorie Terhaar, Larry Walston, Walston
Wings, Inc., Lunds, Inc., and
Edward Brunner.
In re FLIGHT TRANSPORTATION CORPORATION SECURITIES LITIGATION.
Appeal of REAVIS & McGRATH.
 Nos. 83-2021, 83-2114, 83-2115 and 83-2121.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 11, 1983.
Decided March 26, 1984.
 
 Dorsey & Whitney, James H. O'Hagan, Minneapolis, Minn., for appellants Drexel Burnham Lambert Incorporated and Moseley, Hallgarten, Estabrook & Weeden Inc.
 Cahill, Gordon & Reindel, (a partnership including professional corporations) New York City, of counsel, for appellant Drexel Burnham Lambert Inc.
 Shearman & Sterling, New York City, of counsel, for appellant Moseley, Hallgarten, Estabrook & Weeden Inc.
 Gray, Plant, Mooty, Mooty & Bennett, Edward J. Callahan, Jr., Thomas Darling, Dylan J. McFarland, Minneapolis, Minn., for Greyhound Leasing & Financial Corp.
 Robins, Zelle, Larson & Kaplan, Howard Patrick, James R. Safley, Minneapolis, Minn., for Continental Illinois Nat. Bank & Trust Co. of Chicago.
 Faegre & Benson, Duane W. Krohnke, Thomas H. Bennin, Minneapolis, Minn., for Norwest Bank Minneapolis, N.A. and Norwest Bank Calhoun-Isles, N.A.
 Resnick & Bartsh, P.A., Thomas C. Bartsh, Minneapolis, Minn., for Receiver of Flight Transp. Corp. and its subsidiaries.
 Best & Flanagan, James C. Diracles, Frank Vogl, Minneapolis, Minn., for Putnam High Yield Trust, United High Income Fund, Inc. and Oppenheimer High Yield Fund, individually and as certified class representatives of Subclass IV (Unit Purchasers).
 Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.
 ARNOLD, Circuit Judge.
 
 
 1
 This appeal presents the question whether the District Court abused its discretion in approving a "settlement" among claimants in a massive securities-fraud case that has been further complicated by a bankruptcy. We affirm in the main, vacate with respect to one aspect of the settlement, and remand for further proceedings.
 
 I.
 A.
 
 2
 Flight Transportation Corporation (FTC), a Minnesota corporation, and its subsidiary corporations provided air-charter and other general-aviation services. William Rubin was FTC's President, Chairman of the Board, and chief executive officer.
 
 
 3
 In June 1982 FTC made two public offerings of securities. On June 3, 1982, FTC sold 715,000 shares of common stock and, on June 4, 1982, 25,000 "units" of securities, each unit consisting of a debenture and a number of stock warrants. Drexel Burnham Lambert Incorporated and Moseley, Hallgarten, Estabrook & Weeden (Drexel-Moseley) were the lead underwriters, and, on June 10 and June 14, 1982, they delivered certified checks totalling over $24 million to FTC in full payment for the two offerings.[1] FTC deposited these checks in its account at a New Jersey bank.
 
 
 4
 A few days later, on June 18, 1982, the SEC halted trading in FTC securities and commenced an action against FTC, its subsidiaries, and Rubin in the United States District Court for the District of Minnesota, alleging that the defendants had violated several provisions, especially the antifraud provisions, of the federal securities laws.[2] The SEC sought an injunction against further violations, appointment of a receiver, an accounting, and an order of disgorgement so that, apparently, restitution might be made to defrauded investors. See SEC v. Flight Transportation Corp., 699 F.2d 943, 945 & n. 2 (8th Cir.1983). The District Court entered a temporary restraining order and appointed a receiver, who caused some $22.7 million, the remaining proceeds of the June 3 and 4, 1982, offerings, to be transferred from FTC's account in the New Jersey bank to a segregated, interest-bearing account in a Minneapolis bank (the Escrow Fund).[3]
 
 
 5
 Then, on June 23, 1982, Drexel-Moseley filed a class action in the same district court on behalf of themselves and all other persons who had purchased FTC securities pursuant to the June 3 and June 4 offerings.[4] In August 1982 Drexel-Moseley moved for a constructive trust on the Escrow Fund on behalf of members of the public to whom they had sold the June 1982 securities and sought a preliminary injunction against the distribution, commingling, withdrawal, or other disposition of the Escrow Fund. The District Court has never explicitly ruled on this motion.
 
 
 6
 During the following months, the litigation became increasingly complex. A number of separate individual and class actions were filed against FTC, its subsidiaries, its officers and directors, its accountants, and its underwriters. Certain defendants cross-claimed for indemnity, and some of FTC's directors brought suits for damages directly against FTC. On October 8, 1982, about 22 cases were consolidated when a class-action complaint was filed on behalf of all persons who purchased FTC securities between November 30, 1979, and June 18, 1982. Antinore v. Flight Transportation Corp., Master Docket No. 4-082-874 (D.Minn.1982), Jt. App. 693. Moreover, on June 29, 1982, several major creditors filed an involuntary Chapter 11 bankruptcy petition against FTC in the Bankruptcy Court for the District of Minnesota. When the District Court stayed the bankruptcy as well as all other proceedings against the defendants, several appeals to this Court ensued. We directed that the bankruptcy action be allowed to proceed, SEC v. Flight Transportation Corp., 693 F.2d 66 (8th Cir.1982) (per curiam); SEC v. Flight Transportation Corp., Nos. 82-1964, -1990 (8th Cir. Mar. 8, 1983) (order dismissing appeals), and that one of FTC's creditors and William Rubin's wife be allowed to intervene in the SEC action in the District Court, SEC v. Flight Transportation Corp., 699 F.2d 943 (8th Cir.1983). We left open the other major issue on appeal, that of whether the District Court or the Bankruptcy Court should decide the constructive-trust and disgorgement claims, noting that the issue could be addressed in the lower courts and thereafter reviewed on appeal if necessary. SEC v. Flight Transportation Corp., Nos. 82-1964, -1990 (8th Cir. Mar. 8, 1983) (order dismissing appeals).
 
 
 7
 Meanwhile, representatives of persons who had purchased FTC securities and certain business creditors of FTC began negotiating in order to resolve their competing claims to the Escrow Fund. On April 15, 1983, they entered into the "Sharing Agreement" which is the subject of this appeal.
 
 
 8
 On May 18, 1983, the Bankruptcy Court directed that FTC be declared a bankrupt. Subsequently, Judge Charles R. Weiner,[5] who had previously been designated by the Judicial Panel on Multidistrict Litigation to sit as the District Judge in this litigation, was also designated to sit as the Bankruptcy Judge. On May 27, 1983, Drexel-Moseley moved the District Court for summary judgment on its constructive-trust claim and for certification of a constructive-trust-beneficiary class.
 
 
 9
 On June 27, 1983, Judge Weiner held a hearing to consider the Sharing Agreement. Various parties argued the merits of the Sharing Agreement and the constructive-trust claim, among other matters. About three weeks later, Judge Weiner entered the three orders from which these appeals are taken. The first order, Pretrial Order No. 153, certifies as a class all persons who purchased FTC securities between 1979 and 1982, and suffered a loss from such purchase, with the exception of officers and directors of FTC and related companies, other defendants named in the FTC or related actions, and any other person found guilty of wrongdoing in the FTC action or related actions. The class is divided into five subclasses: (1) purchasers of FTC common stock pursuant to a registration statement dated November 30, 1979; (2) purchasers of units of securities of FTC including common stock and warrants, issued pursuant to a registration statement dated March 2, 1981; (3) purchasers of FTC common stock pursuant to a registration statement dated June 3, 1982; (4) purchasers of FTC units consisting of debentures and stock warrants, pursuant to a registration statement dated June 4, 1982; and (5) all class members not included in any of the four preceding subclasses.
 
 
 10
 The second order entered by the District Court, Pretrial Order No. 154, approved the Sharing Agreement. The court found that the Sharing Agreement was fair, adequate, and reasonable, and directed the parties to place it into effect. The third order was entered by Judge Weiner in his capacity as bankruptcy judge, and it authorizes Thomas C. Bartsh, previously appointed as receiver of FTC by the District Court, and later also appointed by the Bankruptcy Court as debtor-in-possession of FTC's bankrupt estate, to become a party to the Sharing Agreement, to bind the estate to the Agreement, and to transfer or assign claims of the estate as necessary to comply with the Sharing Agreement.
 
 
 11
 Drexel-Moseley (the underwriters) appeal all three orders. The remaining appellants--Fox & Company (FTC's auditor), Reavis & McGrath (the underwriters' lawyers), and a group of "outside" directors of FTC (the Adams Group)--appeal the latter two orders.
 
 B.
 
 12
 Under the Sharing Agreement, persons, including the receiver and the bankruptcy estate, who have claims against FTC or other defendants agree to prosecute their claims jointly, to pool their recoveries, whether from the Escrow Fund, other assets of FTC, or damage actions against any of the defendants, and to disburse the money among themselves in accordance with an agreed-upon schedule. Defendants, defined as "[a]ny PERSON against whom any CLAIMANT has any claim for a monetary recovery arising out of or related to the CLAIMANT's claim against FTC," Jt.App. 360, are excluded from the Sharing Agreement.
 
 
 13
 The Agreement provides that, first, the pooled recoveries will be divided between creditors and securities claimants. The securities claimants, also known as the "class plaintiffs," are divided into subclasses in accordance with Pretrial Order No. 153. The pooled recoveries are allocated according to the following schedule, set out in paragraph "O" of the Sharing Agreement:
 
 
 14
 (1) The initial $25,000,000 of TOTAL RECOVERIES shall be allocated as follows:
 
 
 15
 CREDITORS $11,000,000
SUBCLASS I and II 500,000
SUBCLASS III 1,250,000
SUBCLASS IV 11,000,000
SUBCLASS V 500,000
EXPENSE FUND 750,000
 
 
 16
 (2) The next $5,000,000 of TOTAL RECOVERIES shall be allocated as follows:
 
 
 17
 CREDITORS $1,500,000
SUBCLASS I and II 500,000
SUBCLASS III 1,000,000
SUBCLASS IV 1,500,000
SUBCLASS V 500,000
 
 
 18
 (3) The next $5,000,000 of TOTAL RECOVERIES shall be allocated as follows:
 
 
 19
 CREDITORS $1,800,000
SUBCLASS I and II -0-
SUBCLASS III 500,000
SUBCLASS IV 2,700,000
SUBCLASS V -0-
 
 
 20
 Jt.App. 379. The class plaintiffs agree not to assert any claim against funds allocated to creditors. Jt.App. 370.
 
 
 21
 Next, the source of each recovery in the creditors' allocation is identified, and the creditors' allocation is suballocated into two funds. Fund A, which becomes the bankruptcy estate, consists of all recoveries from the creditors' part of the "ESCROW FUND or Assets of FTC (except to the extent that an Asset of FTC consists of a claim against present or former officers, directors, accountants or attorneys of FTC, or underwriters of FTC securities ...) ...." plus five per cent. of all other recoveries. Fund B consists of the remaining recoveries, i.e., 95 per cent. of the recoveries from sources other than the Escrow Fund or FTC's assets. Thus, Fund B is comprised of the creditors', class plaintiffs', and FTC's recoveries from defendants other than FTC: the officers and directors, underwriters, accountants, lawyers, and so forth. These defendants cannot participate in Fund B (which is available only to "Participating Creditors," defined so as to exclude these defendants), although they are free to make claims against the bankruptcy estate (which consists of Fund A).
 
 
 22
 The operation of the Sharing Agreement may be illustrated by a simplified diagram, which does not purport to be proportionately accurate:
 
 
 23
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 II. JURISDICTION
 
 24
 The appellees argue that we do not have jurisdiction to hear these appeals because none of the orders appealed from is final. We disagree. Under 28 U.S.C.A. Sec. 1292(a)(1) (West Supp.1983), we have jurisdiction of appeals from "[i]nterlocutory orders ... refusing ... injunctions ...." When an order has the practical effect of refusing an injunction, it is immediately appealable under Sec. 1292(a)(1) if it "might have a 'serious, perhaps irreparable, consequence' " and "can be 'effectually challenged' only by immediate appeal." Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981) (quoting Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955)).
 
 
 25
 The District Court, by entering the orders which, taken together, both approve the Sharing Agreement and permit the parties to implement it, effectively denied Drexel-Moseley's motion for a preliminary injunction to prohibit the commingling or disposition of the Escrow Fund, since the very purpose of the Sharing Agreement is to create and disburse a pooled fund consisting, in large part, of the Escrow Fund.[6] Since claimants who receive distributions from the Escrow Fund would probably spend or otherwise dissipate them, Drexel-Moseley's ability to trace the proceeds of the June 1982 offerings, a necessary element of their constructive-trust claim, see, e.g., Restatement of Restitution Sec. 215 (1937), would be impaired. And since the difficulties of tracing would become greater as time went on, Drexel-Moseley might not be able to obtain relief on appeal after a final order was entered. Thus, Drexel-Moseley has made a sufficient showing of the possibility of serious or irreparable harm, so that we have jurisdiction under Sec. 1292(a)(1).[7]
 
 III. THE MERITS
 
 26
 A. CHARACTERIZATION OF THE SHARING AGREEMENT
 
 
 27
 The Adams Group and Reavis & McGrath argue that the Sharing Agreement is a de facto plan for the liquidating reorganization of FTC, approved without compliance with the requirements of the Bankruptcy Code.[8] They assert that the Agreement contemplates the transfer of all the assets of the estate of FTC and its subsidiaries to third parties, followed by distribution of the liquidated proceeds of certain assets to specified parties. They also point out that the Agreement contains provisions designed to marshal, consolidate, administer, and distribute all of the FTC assets; contains voting procedures for certain groups of FTC claimants; provides for assignment of duties with respect to the continued prosecution and settlement of certain outstanding claims against FTC; and establishes bank accounts for the payment of certain fees and expenses and for the allocation of proceeds of recoveries against FTC to creditors and security holders.
 
 
 28
 We think the Sharing Agreement is more like a compromise or settlement than a plan of reorganization. The main thrust of the Agreement is to conclude the parties' controversy as to (1) whether the entire Escrow Fund is properly includible in the bankruptcy estate, subject to the claims of FTC's general creditors, who, under 11 U.S.C. Sec. 510(b), would have priority over the claims of security holders, or (2) whether no part of the Escrow Fund became property of the estate, but rather belonged entirely to the June 1982 purchasers by virtue of a constructive trust. The parties compromised by agreeing that part of the Escrow Fund would go to the bankruptcy estate and part would go to the security holders.[9] The bankruptcy case will proceed according to regular bankruptcy procedure.
 
 
 29
 The Sharing Agreement also provides for a second level of allocation, between the bankruptcy estate (Fund A) and a fund (Fund B) available only to "Participating Creditors," i.e., creditors who are not also defendants or potential defendants in FTC-related litigation. Part of Fund B contains recoveries from sources other than FTC's assets or the Escrow Fund, property which would not have been included in the bankruptcy estate in any event. While it is true that Fund B will also contain recoveries on any claims that FTC might have against its officers, directors, accountants, lawyers, and underwriters, we do not believe that this provision alone destroys the essential nature of the Sharing Agreement as a compromise or settlement.
 
 
 30
 It is also of some relevance that, although the bankruptcy case was brought under Chapter 11, the ultimate outcome of this litigation will be the liquidation of FTC, not its continued operation as a reorganized business.
 
 
 31
 A corporate reorganization is a continuing business affair requiring close supervision and affecting many interested parties. The success or failure of a reorganization may hinge upon the very compromise at issue. A liquidation bankruptcy is a terminal affair. The bankrupt's financial affairs are beyond repair. Liquidation is to be accomplished as rapidly as possible consistent with obtaining the best possible realization upon the available assets and without undue waste by needless or fruitless litigation.
 
 
 32
 In re Blair, 538 F.2d 849, 852 (8th Cir.1976) (footnote omitted). The Adams Group and Reavis & McGrath, to the extent that they are creditors, are concerned not with ensuring the future profitable conduct of the business, but with the size of the bankrupt's estate and how it is to be divided. Thus, if the Sharing Agreement is in some sense a reorganization, it is not a typical one. The Adams Group presented their arguments on these points to Judge Weiner at the hearing held on June 27, 1983. While Reavis & McGrath did not receive notice of the hearing, the arguments that they make here were presented by other parties in attendance. Neither appellant explains why the procedural provisions of Chapter 11 regarding the formulation and approval of a plan would have afforded them significantly greater benefits than those they received. See also In re Ericson, 6 B.R. 1002 (D.C.D.Minn.1980).
 
 
 33
 In re Braniff Airways, Inc., 700 F.2d 935 (5th Cir.1983), cited by the appellants, is inapposite. Unlike the case before us, Braniff involved the question whether an agreement to transfer assets of the bankrupt was invalid under the "use, sale, or lease" provision of 11 U.S.C. Sec. 363(b). Moreover, the Sharing Agreement, unlike the Braniff agreement does not dictate the terms of any future reorganization plan, since the assets of the bankruptcy estate will be distributed in the normal course of the bankruptcy proceeding; it does not require any claimant to vote in favor of any future reorganization plan; and the only release of claims involved is the class plaintiffs' release of their own claims against FTC's estate.
 
 
 34
 For these reasons, we hold that the Sharing Agreement is not invalid as a plan of reorganization approved in violation of the Bankruptcy Code, but rather is to be judged according to the principles governing approval of settlements and compromises.
 
 B. STANDARD OF REVIEW
 
 35
 The approval of a settlement under Fed.R.Civ.P. 23(e) as fair, reasonable, and adequate "is committed to the sound discretion of the trial judge." Grunin v. International House of Pancakes, 513 F.2d 114, 123 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (quoting Ace Heating & Plumbing Co. v. Crane Co., 453 F.2d 30, 34 (3d Cir.1971)). In exercising its discretion, the District Court must consider all factors bearing on the fairness of the settlement, including
 
 
 36
 (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.
 
 
 37
 Drexel v. Loomis, 35 F.2d 800, 806 (8th Cir.1929). Accord, Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). Drexel and Anderson involve approval of settlement in bankruptcy cases, and the same standards apply to the approval of a class-action settlement under Rule 23(e). Grunin, supra, 513 F.2d at 124.
 
 
 38
 Our review is made more difficult because the District Court did not write an opinion explaining why it deemed the Sharing Agreement to be fair, reasonable, and adequate. The Supreme Court has cautioned that, when reviewing the approval of a settlement,
 
 
 39
 [i]t is essential ... that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law.
 
 
 40
 Anderson, supra, 390 U.S. at 434, 88 S.Ct. at 1168. Nonetheless, if
 
 
 41
 the record contained adequate facts to support the decision of the trial court to approve the proposed compromises, a reviewing court would be properly reluctant to attack that action solely because the court failed adequately to set forth its reasons or the evidence on which they were based.
 
 
 42
 Id. at 437, 88 S.Ct. at 1170. Here, the record reflects that the District Court had before it the information necessary to consider the fairness of the Sharing Agreement. All the arguments made before us were presented to the District Court. Accordingly, we shall review the District Court's action on the basis of the record before us.
 
 C. STRENGTH OF THE CONSTRUCTIVE-TRUST CLAIM
 
 43
 Drexel-Moseley, Fox, and Reavis & McGrath[10] argue that the Sharing Agreement is unfair to the June 1982 purchasers, that Drexel-Moseley's entitlement to a constructive trust on the Escrow Fund is so clear that Judge Weiner abused his discretion by approving a settlement that, in effect, bargained away almost half of it. They assert that the Escrow Fund never became "property of the estate" under 11 U.S.C. Sec. 541 (1982), pointing to the principle that
 
 
 44
 a Trustee in Bankruptcy can have no interest in property acquired by the fraud of a bankrupt, or anyone else, as against the claim of the rightful owner of such property.
 
 
 45
 * * *
 
 
 46
 * * *
 
 
 47
 Property obtained by fraud of the bankrupt, or by other tort, is not properly a part of the assets of a bankrupt's estate.
 
 
 48
 Nicklaus v. Bank of Russellville, 336 F.2d 144, 146, 147 (8th Cir.1964); see also, e.g., In re Teltronics, Ltd., 649 F.2d 1236, 1239 (7th Cir.1981).
 
 
 49
 We agree that Nicklaus correctly states the general rule. Under Sec. 541(a)(1), the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." This principle is refined in Sec. 541(d):
 
 
 50
 Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property ... becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
 
 
 51
 Thus, where, under state law, the debtor's fraud or other wrongful conduct gives rise to a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions. E.g., In re Shepard, 29 B.R. 928, 931-32 (Bkrtcy.M.D.Fla.1983); 4 Collier on Bankruptcy p 541.13 (15th ed. 1983).
 
 
 52
 The appellees argue, however, that where, as here, the constructive-trust claim is based on a security holder's allegation of fraud, the general rule does not apply. They point to 11 U.S.C. Sec. 510(b) (1982), which provides:
 
 
 53
 Any claim for recission [sic] of a purchase or sale of a security of the debtor or of an affiliate or for damages arising from the purchase or sale of such a security shall be subordinated for purposes of distribution to all claims that are senior or equal to the claim or interest represented by such security.
 
 
 54
 The legislative history indicates that Congress may have intended to foreclose constructive-trust claims by defrauded shareholders to the extent that such claims would give the shareholders priority over general unsecured creditors. H.R.Rep. No. 595, 95th Cong., 2d Sess. 194-96, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6154-57 (House Report). By enacting Sec. 510(b), Congress intended to resolve a "difficult policy question": whether a security holder who seeks to rescind his purchase should "be subordinated to, share pari passu with, or have priority over, unsecured creditors ...." House Report at 194, 195, U.S.Code Cong. & Admin.News 1978, p. 6155. After noting that the case law was unsettled and observing that "[t]here is also authority under present law that if a security holder can trace the consideration paid into proceeds of the estate then he can, in straight bankruptcy, either reclaim the consideration or assert a security interest in the proceeds as a secured creditor," House Report at 195, U.S.Code Cong. & Admin.News 1978, p. 6155, the Committee referred approvingly to the position set out by Professors Slain and Kripke in their article, The Interface Between Securities Regulation and Bankruptcy--Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors, 48 N.Y.U.L.Rev. 261 (1973). According to this view, since "the unsecured creditor [relies] on an apparent cushion of equity securities in making the decision to extend credit," the risk of illegality in securities issuance should be borne by the securities purchasers, not the general creditors. House Report at 195, U.S.Code Cong. & Admin.News 1978, p. 6155. "The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors." Ibid.
 
 
 55
 The appellants respond that Sec. 510(b) was not intended to apply in the situation presented here. They assert that Sec. 510(b) is irrelevant to the threshold question whether particular property is properly included in the estate, but addresses only the priority of claims "for purposes of distribution" once the composition of the estate has been determined. Under the appellants' view, Sec. 510(b) properly applies only where defrauded investors cannot trace a res upon which to impose a constructive trust. Further, they argue that the rationale of the Slain/Kripke view fails here, because no creditor relied on the "equity cushion" provided by the June 1982 purchasers, and because those purchasers got no benefit from their investment, since the SEC halted trading and the cases against FTC were filed almost immediately thereafter.
 
 
 56
 It appears that no reported opinion addresses the precise question presented here. But cf. In re U.S. Financial Inc., 648 F.2d 515, 517-21 (9th Cir.1980), cert. denied, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981) (holding that, under prior law but using Slain/Kripke analysis, absolute-priority rule defeated claim for rescission and reclamation, even though res could be traced). We need not resolve it now. We merely hold that there was a substantial question whether Drexel-Moseley would prevail on its constructive-trust claim.[11] The constructive-trust claim was not so strong as to make it an abuse of discretion to approve a settlement that roughly splits it in half. This conclusion is strengthened by the fact that the great majority of the purchasers of the June 1982 offerings--the parties who would benefit most from the unqualified success of the constructive-trust theory--support the settlement and urge its approval.
 
 D. DISCRIMINATION AGAINST DEFENDANTS
 
 57
 Reavis & McGrath and the Adams Group argue that the Sharing Agreement unfairly discriminates against them by excluding them from participation in Fund B, which consists of the creditors' share of recoveries from FTC's officers, directors, underwriters, and so forth. These appellants argue that, while they are defendants in the FTC litigation, they also have claims for indemnification and in tort and contract. They assert that they should not be treated differently from other creditors merely because they are also defendants. They emphasize that they have not been found guilty of any wrongdoing.
 
 
 58
 Appellees seek to defend this aspect of the Sharing Agreement by asserting that they have a right to agree among themselves to pool money that they recover from FTC's officers, directors, underwriters, and the like, and to divide up the pool as they see fit. The Agreement, they say, has nothing to do with the bankruptcy estate. It simply creates a separate fund out of money that would never have been in the bankruptcy estate in the first place, and provides for the division of this fund. Thus, claimants against the bankruptcy estate cannot be hurt by and can have no interest in this aspect of the Sharing Agreement. To the extent that Fund B is composed of recoveries by persons other than the trustee on behalf of FTC, this argument has merit. The persons who secure these recoveries are completely free to divide them in any way they see fit. The difficulty with the argument, however, is that some of the money recovered by FTC itself, or by its trustee or debtor-in-possession, from officers and directors, underwriters, accountants, lawyers, and so forth, also goes into Fund B. These recoveries would otherwise be part of the bankruptcy estate, and the effect of the Sharing Agreement is to exclude certain creditors from full participation in them.
 
 
 59
 We cannot agree that appellants in the position of the Adams Group and Reavis & McGrath can be excluded altogether from participation in this latter class of recovery simply because they have been named as defendants in suits brought as a result of the FTC debacle. A court of bankruptcy has, to be sure, the right to approve settlements, and may do so, in a proper case, over the objection of some parties, so long as a settlement is found to be in the best interests of the estate as a whole. In the present case, however, we know nothing of the merits of any of the claims made against the "outside" directors, to take one example. This aspect of the settlement, therefore, cannot be justified by the same kind of reasoning used in our discussion of the construction-trust argument. It was possible, with respect to that aspect of the settlement agreement, to weigh the respective merits of each side of the legal dispute and decide whether the settlement was fair and reasonable in view of the likelihood of either side's success. The record contains no information that would enable us to perform a similar operation with respect to the disputed aspects of Fund B, and the District Court's order contains no findings on this subject. If a non-management director of FTC, to take one instance as an illustration, is wrongly accused of wrongdoing and is ultimately vindicated, and if the bylaws of FTC provide that such a director is entitled to indemnification for the costs and expenses of the unsuccessful suit against him, we see no reason, at least so far as the record has been developed to date, why his claim for indemnity should be a priori treated differently from, and less advantageously than, the claims of other creditors of FTC.
 
 
 60
 Of course, the principles of equitable subordination, now codified in 11 U.S.C. Sec. 510(c) (1982), will continue to apply, and the bankruptcy court is free, in later proceedings, to determine upon a proper record that the claims of particular defendants should be subordinated to the claims of other creditors. See, e.g., Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Farmers Bank v. Julian, 383 F.2d 314, 322-23 (8th Cir.), cert. denied, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967).
 
 IV. CONCLUSION
 
 61
 In sum, the success of Drexel-Moseley's constructive-trust claim was problematical. Both the June 1982 purchasers and the creditors were at risk of losing the entire Escrow Fund. The June 1982 purchasers, the prospective beneficiaries of the constructive trust, urged that the compromise be approved. The Sharing Agreement forecloses litigation on the constructive-trust issue, and does not appear to increase the complexity or likely duration of the portion of the case that remains to be litigated. In these circumstances, the District Court wisely exercised its discretion in approving the division of the Escrow Fund. Similarly, the division of the creditors' allotment into Fund A and Fund B, insofar as Fund B is comprised of monies that would not be part of the bankrupt's estate in any event, is likewise fair, adequate, and reasonable, and the District Court's approval of that aspect of the Sharing Agreement is also affirmed.
 
 
 62
 Nevertheless, the exclusion of defendants who are also creditors, and who did not agree to the Sharing Agreement, from sharing in that portion of Fund B attributable to FTC's recoveries from defendants cannot be allowed to stand. To the extent that they approve this aspect of Fund B, the orders of the District Court are vacated, and the cause will be remanded for such further proceedings as may be just, not inconsistent with this opinion. We assume that this aspect of the Sharing Agreement is relatively minor, from the point of view of the parties who signed the Agreement. The major effect of the Agreement remains undisturbed, and if our assessment of the relative importance of the issues on appeal is correct, the appellees will remain satisfied with the Agreement, even if it must ultimately be modified in respect of one aspect of the disposition of Fund B. If, however, appellees believe that our disapproval of the exclusion of the defendants from participation in those assets of FTC allocated to Fund B seriously compromises the value of their bargain under the Sharing Agreement, they may apply for appropriate relief in the district court or the bankruptcy court, as the case may be.
 
 
 63
 Affirmed in part, vacated in part, and remanded. The appellants Reavis & McGrath and the Adams Group shall be entitled to recover their costs against appellees and intervenors. Appellees and intervenors shall be entitled to recover their costs against appellants Drexel-Moseley and Fox & Co. In all other respects the parties shall bear their own costs.
 
 
 64
 It is so ordered.
 
 
 
 [1]
 Drexel-Moseley paid FTC $6,309,875 for the 715,000 shares of common stock and $18,001,562.50 for the 25,000 "units."
 
 
 [2]
 For example, the SEC alleged that on registration statements, prospectuses, and other documents the defendants had overstated gross revenues, miles flown, and number of helicopter and charter flights; that Rubin and others had engaged in a check-kiting scheme; and that Rubin had misapplied FTC funds
 
 
 [3]
 The fund now exceeds $25 million, including accrued interest
 
 
 [4]
 Drexel-Moseley and other members of the underwriting syndicate bought all of the securities in the June 1982 offerings pursuant to their agreement with FTC, Joint Appendix (Jt.App.) 55-58, and then resold most of them to the investing public. Drexel-Moseley still own about $300,000 worth of the June 1982 securities
 
 
 [5]
 United States District Judge for the Eastern District of Pennsylvania, sitting by designation in the District of Minnesota
 
 
 [6]
 Pretrial Order No. 153, which certified a class of securities purchasers and named class representatives, effectively denied Drexel-Moseley's motion for certification of a constructive-trust-beneficiary class. Although orders denying class certification are ordinarily not immediately appealable, see, e.g., Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978), an exception exists where the denial of class certification is interdependent with the remainder of the appealed order, see In re Federal Skywalk Cases, 680 F.2d 1175, 1180 (8th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 342, 74 L.Ed.2d 383 (1983). Here, we view the orders appealed from as, in effect, one order that approves the Sharing Agreement and directs the parties to implement it, and we shall consider it as an integrated whole
 
 
 [7]
 The appellees point out that, under the Sharing Agreement, the Escrow Fund may not be actually disbursed to claimants without the lower court's approval, Jt.App. 378, 385. Nevertheless, we do not believe that the appellants are required to wait until the first order approving a disbursement is entered in order to appeal. The orders before us completely dispose of the substantive issue of who is entitled to share in the Escrow Fund; the mode of distribution set forth in the Sharing Agreement is irreconcilable with the constructive-trust theory. Actual disbursement will occur as soon as the lower court performs the relatively ministerial act of approving allocations recommended by the Claimants' Committee
 The appellees also argue that the appellants do not have standing to contest the approval of the Sharing Agreement, because they are not parties to the Agreement and because it does not affect their liability. We disagree. It is enough that the Sharing Agreement enlarges the appellants' exposure to possible liability, because the June 1982 securities purchasers may seek to recover from the appellants the difference between the amount the purchasers paid for the June 1982 securities and the amount they recover under the Sharing Agreement.
 
 
 [8]
 The appellants assert that the District Court failed to comply with any of the statutory requirements regarding the contents of a reorganization plan, 11 U.S.C. Sec. 1123; the preparation of disclosure statements regarding such a plan, 11 U.S.C. Sec. 1125; the provisions for voting on the plan by all interested parties, 11 U.S.C. Sec. 1126; the standards for the court's confirmation of the plan, 11 U.S.C. Sec. 1129; and the appointment of a creditors' committee, 11 U.S.C. Sec. 1102(a)(1)
 
 
 [9]
 We assume, as do the parties, that the Escrow Fund will be among the first assets distributed under paragraph "O" of the Sharing Agreement
 
 
 [10]
 The Adams Group does not argue in favor of the constructive trust
 
 
 [11]
 For this reason, we reject the appellants' argument that the notice of the proposed settlement was deficient because it failed to advise the class members of the high likelihood of success on the constructive-trust claim. "[T]he notice may consist of a very general description of the proposed settlement, including a summary of the monetary or other benefits that the class would receive and an estimation of attorneys' fees and other expenses." Grunin, supra, 513 F.2d at 122. The notice sent in this case fully satisfied this standard. Nor, in view of the history of this litigation, do we believe that the time between the giving of notice and the hearing was unduly short. See id. at 121