51 B.R. 340 (1985)
In re A.E.F.S., INC., Debtor.
Edward W. BERGQUIST, Trustee, Plaintiff,
v.
WIESE & COX, LTD., and State of Minnesota, Defendants.
Bankruptcy No. 3-83-931, Adv. No. 84-0222.
United States Bankruptcy Court, D. Minnesota, Third Division.
June 17, 1985.
*341 Edward Bergquist, Minneapolis, Minn., for plaintiff.
Charles Wikelius, Sp. Asst. Atty. Gen. of Minnesota, St. Paul, Minn., for defendants.

MEMORANDUM ORDER GRANTING PARTIAL SUMMARY JUDGMENT
DENNIS D. O'BRIEN, Bankruptcy Judge.
This adversary proceeding was commenced by Plaintiff Trustee against Defendant State of Minnesota (State) to recover a fund originally held in trust by Defendant Wiese & Cox, Ltd., pursuant to a prepetition Assurance of Discontinuance Agreement entered into between the Debtor and the State. Plaintiff appears on his own behalf and Defendant State appears by Charles I. Wikelius, Special Assistant Attorney General. Defendant Wiese & Cox has been dismissed from the action with prejudice pursuant to an earlier stipulation of the parties and Order of the Court. The controversy has otherwise been submitted on cross-motions for summary judgment.
Based upon the motions, the arguments of counsel, and upon all of the records and files in the matter, the Court makes this Order pursuant to the Federal Rules of Bankruptcy Procedure.

I.
The Debtor is a Minnesota corporation which until May 23, 1983, maintained its principal place of business in the City of Marshall. Beginning in 1981, the Debtor engaged in the business of offering and selling Jerusalem artichoke seedstock tubers to growers in Minnesota, Iowa, and other states throughout the United States.[1] In its contracts with growers, AEFS agreed to provide a number of services along with the seed. Most important of these was to be its best efforts to market the tubers that its growers would harvest.
The Debtor's initial sales efforts were very successful. During the first sales year, marked from the Fall of 1981 through the Spring of 1982, AEFS sold approximately 5,000 acres of seed tubers to 451 growers at a total price of more than $5,000,000.00.[2]
In 1982, the Consumer Division of the Minnesota Attorney General's Office began an investigation into the business practices of AEFS.[3] The investigation conducted under authority of MINN.STAT. § 8.31 focused on suspected violation of Minnesota laws relating to false or fraudulent advertising and the prevention of consumer fraud. The Attorney General ultimately alleged that the principals of AEFS had engaged in the following illegal and deceptive practices:
A. Employing representations, contrary to known facts, that were designed to convince prospective growers that they were likely to earn large profits by raising the plants to supply seed for sale by AEFS in its expansion of crop in America and for other purposes, without disclosing the nature and extent of the risks involved.

*342 B. Employing false and misleading representations regarding the role of AEFS in marketing the tubers.
C. Employing false and misleading representations regarding both existing and anticipated ethanol markets for the crop.
D. Employing false and misleading representations regarding anticipated butanol markets.
E. Employing false and misleading representations regarding anticipated fructose markets.
F. Employing false and misleading representations regarding both existing and anticipated human food markets.
G. Employing false and misleading representations regarding both existing and anticipated animal feed markets.
H. Employing false and misleading representations regarding characteristics of the plant itself.
Apparently, the Attorney General believed that the business was nothing more than a scheme designed to generate large profits from development and expansion of crop that the principals of AEFS knew would have no market other than a short-term one for seed to further expand the crop.
AEFS denied any violation of Minnesota law and contended that its business was operated in good-faith. Nevertheless, on March 24, 1983, the State and the Debtor, along with its principals, entered into an agreement pursuant to MINN.STAT. § 8.31, Subd. 2(b) termed Assurance of Discontinuance. The Agreement recited in detail the allegations and denials outlined above and provided, among other things, that:
1. It was not to be considered an admission by AEFS of any violations of Minnesota law "for any purpose whatsoever".
2. Violation of the agreement could subject the principals to sanctions for contempt by order of a state district court.
3. The Attorney General could, without notice, obtain state district court approval of the agreement and the state district court would thereafter retain jurisdiction of the matter for the purpose of such orders as might be necessary to interpret, modify or enforce it.[4]
4. AEFS would offer, on or before April 30, 1983, to each grower who agreed prior to March 25, 1983, to purchase tubers, the opportunity to rescind his purchase and receive a refund of all monies paid to AEFS less any payment received from AEFS.
5. AEFS would pay to the State as a civil penalty pursuant to MINN. STAT. § 8.31 (1982), the sum of $25,000.00.
The parties further agreed, confirmed by letter of March 22, 1983, from Special Assistant Attorney General Douglas Blanke to attorneys for AEFS, that the Debtor would establish and maintain a $500,000.00 escrow account for the purpose of honoring rescission requests.[5] Pursuant to the terms of that agreement, the attorneys for AEFS, Wiese & Cox, Ltd., set aside $500,000.00 in their law firm trust account from money they had received in February of 1983 from AEFS as a retainer for legal services to be rendered. On April 15, 1983, this fund, with accrued interest of $7,584.51, was transferred to a special trust account at First National Bank of Minneapolis, established for the purpose of honoring rescission requests. The fund remained *343 under the control of Wiese & Cox, Ltd.
AEFS began making rescission offers to its growers in April of 1983. A number of growers had planned to receive delivery of and plant their seeds during that month. Rescission offers were hand-delivered to these growers between April 5 and April 28 to enable them to consider the offers prior to receipt and planting of the seed. On April 30, AEFS sent rescission offers by certified mail to the remaining growers who were entitled to receive them.
On April 28, 1983, $120,607.00 was paid out of the trust account in settlement to rescinding growers. The account was not replenished until May 10, 1983, when AEFS deposited funds into the trust to cover that withdrawal.[6]
In the meantime, AEFS was deluged with rescission requests pursuant to its April 30 mailing. As of May 12, 1983, when post-April 28 requests had been processed, there were an additional 393 requests for refunds totalling more than $5,000,000.00. AEFS concluded that it was financially unable to pay the refunds and no rescission requests received after April 28, 1983, were honored.
A total of 521 growers accepted the rescission offers amounting to approximately $6,396,744.00. Of that amount, about $5,769,105.00 remains owing to 471 growers whose requests were received after April 28, 1983.
On May 23, 1983, AEFS filed for relief under 11 U.S.C. Chapter 11. At the time of filing, more than $500,000.00 remained in the trust account at First National Bank of Minneapolis pursuant to the prepetition agreement between AEFS and the State of Minnesota. None of that amount can be traced to funds received by AEFS from individual growers.
The bankruptcy trustee brought this action on August 16, 1984, for: turnover of the escrow fund as property of the estate; or, in the alternative, for declaratory judgment that transfer of the fund to Wiese & Cox constituted a preferential transfer avoidable under 11 U.S.C. § 547. On September 25, 1984, based on stipulation of the parties approved by Order of this Court, Wiese & Cox delivered the escrow fund in the total amount of $563,240.69 to the trustee and was dismissed from the proceeding with prejudice. The Court now has before it the trustee's motion for summary judgment on both alternative theories and the State's motion for summary judgment that the transfer to Wiese & Cox was not a preferential transfer.

II.

DEBTOR'S MOTION FOR SUMMARY JUDGMENT
A major premise of the trustee's argument is that the money constituting the fund at issue was obtained by the Debtor through fraud. He not only concedes the probability of that unfortunate circumstance, but acknowledges that for purposes of his motion for summary judgment, the Court must assume that the fund is entirely the proceeds of the Debtor's fraud.[7]
A. Turnover as § 541 Property
Generally, all legal or equitable interests of a debtor in property as of the *344 commencement of a case, become property of the bankruptcy estate. See: 11 U.S.C. § 541(a)(1). However, property obtained by fraud of a debtor does not properly become part of the assets of a debtor's estate. Lambert v. Flight Transportation Corp. (In re Flight Transportation Corp.), 730 F.2d 1128 (8th Cir.1984). At most, a bankruptcy trustee might acquire, at commencement of a case, bare legal title to such property, with the equitable interest remaining in the defrauded party.
Here, legal title to the fund in dispute was, at commencement of the bankruptcy case, in Wiese & Cox, Ltd. Since the Debtor did not have legal title at the time of filing, no legal interest passed to the trustee. Assuming the fund to be the proceeds of fraud, the trustee acquired no equitable interest in it either. The entire equitable interest remained in defrauded parties.
Accordingly, assuming for purposes of the trustee's motion, that the fund consists entirely of the proceeds of fraud, it is not subject to turnover as § 541 property of the estate because the Debtor had, at the time of filing, no legal or equitable interest in it.
B. Creation of the Fund as Preference
In the alternative, the trustee seeks: (1) declaratory judgment that the initial transfer of the fund to Wiese & Cox constituted a preferential transfer; and (2) a turnover order based on his avoidance powers under 11 U.S.C. § 547. However, assuming the fund to be proceeds of the Debtor's fraud, its prepetition transfer to Wiese & Cox is not avoidable by the trustee under § 547.
Only the transfer of property of a debtor[8] is avoidable under § 547. See 11 U.S.C. § 547(b) (1983). In this case, assuming the money transferred to be entirely the proceeds of fraud, it was not the Debtor's property in the first instance.
Accordingly, payment into the fund did not constitute a transfer of property of the Debtor. Furthermore, the transfer of bare legal title for the benefit of the property's true owners did not constitute a transfer for the benefit of creditors on account of antecedent debts.
C. Tracing
The trustee resists the foregoing conclusions on the strength of the fact that no part of the fund can be traced to money received from individual growers. The role of tracing in determining the rights of interested parties who are victims of "Ponzi" type schemes has been the subject of focus in a number of cases. See: Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); Lambert v. Flight Transportation Corp. (In re Flight Transportation Corp.), 730 F.2d 1128 (8th Cir.1984); Heyman v. Kemp (In re Teletronics, Ltd.), 649 F.2d 1236 (7th Cir.1981); and Merrill v. Abbott (In re Independent Clearing House Co.), 41 B.R. 985 (Bankr.Ill.1984).[9]
To a significant degree existing law is inconsistent, contradictory and inconclusive. Perhaps the reason for this is that in each case not only are circumstances of the scheme different, but circumstances of the collapse are different as well. Each case struggles under a unique set of facts to deal fairly with competing interests in property that is insufficient to fully satisfy all interests. Caution must be exercised in drawing rules of general application from the cases.
Here, assuming the fund to consist entirely of the proceeds of the Debtor's fraud, there appears to be no competing interest of the estate in it. The trustee acquired no interest at commencement of *345 the case, since the Debtor had none. Legal title, the entire equitable interest, and possession were all elsewhere. Under these circumstances where the property:
1. has been obtained by fraud of the Debtor;
2. has been identified and conveyed to a third party prepetition for the benefit of its true owners pursuant to a state statutory provision for administration and distribution under supervision of a state district court; and
3. has prepetition claims against it by defrauded parties far in excess of its value;
failure of some or all defrauded parties to trace their money into the property cannot result in the creation of an interest of the bankruptcy estate in the fund. Furthermore, failure of tracing under these circumstances cannot render the prepetition transfer of the property to the fund avoidable under 11 U.S.C. § 547, since the failure cannot result in the creation of an equitable interest of the Debtor in the property prior to its transfer. The transfer remains a transfer of only bare legal title for the benefit of the property's true owners, not for the benefit of creditors on account of antecedent debts. The fact that those owners might have difficulty among themselves in reclaiming their property is not sufficient to provide a basis for the bankruptcy trustee's involvement where title was transferred to a third party prepetition and the property is subject to supervision and control by the state district court.

III.

STATE'S MOTION FOR SUMMARY JUDGMENT
The State seeks summary judgment that creation of the fund did not constitute a preferential transfer which may be avoided by the trustee pursuant to 11 U.S.C. § 547. For purposes of the State's motion, the Court assumes that the fund is not constituted entirely of proceeds of the Debtor's fraud.[10]
Under that assumption, the Debtor retained the equitable interest in the fund following the transfer subject to an obligation to utilize it for payment to growers who might accept the rescission offers. Creation of the fund transferred only bare legal title to Wiese & Cox for the purpose of satisfying potential future obligations of the Debtor to individual growers arising out of rescission contracts.
Prior to its 1984 amendment, 11 U.S.C. § 547 provided in pertinent part:
(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor 
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
Even assuming that the fund is not proceeds of fraud, under the circumstances of this case, the transfer to Wiese & Cox did not constitute a transfer avoidable by the trustee pursuant to § 547. Those growers who had later elected to rescind were not creditors of the Debtor at the time of the transfer. They were to become creditors of the Debtor only upon their individual acceptances of the rescission offers. Accordingly, the transfer was not for the benefit of creditors on account of antecedent debts "owed by the debtor before such transfer was made".

IV.
Regardless of whether the fund is constituted of proceeds obtained by the Debtor through fraud, the transfer to Wiese & Cox is not avoidable by the trustee under 11 U.S.C. § 547. If it be entirely the proceeds of fraud, no property of the Debtor was transferred. An interest of the Debtor in the property was transferred, bare legal title, but not for the benefit of creditors. *346 Assuming the fund to be the proceeds of fraud, title was transferred for the benefit of the property's owners. To the extent the fund is not proceeds of fraud, its transfer to Wiese & Cox was property of the Debtor, but not for the benefit of creditors on account of antecedent debts owed by the Debtor before the transfer was made.
However, determination of the § 547 claim does not resolve the dispute regarding entitlement to the fund. The trustee alleges in his complaint that the fund is property of the estate and insists that it should be available for all creditors. The State claims that the fund is entirely proceeds of fraud and insists that it should be available only to rescinding growers pursuant to the Assurance of Discontinuance Agreement to be administered under the supervision of the state district court.
Determination of whether the fund is property of the estate, and if so, which creditors are entitled to it, depends upon resolution of issues of material fact that are, as yet, unresolved.[11] To the extent that it does not constitute the proceeds of fraud, the fund consists of property of the Debtor transferred prepetition to a custodian for the benefit of the Debtor's creditors.[12] The term "custodian" is defined by the Bankruptcy Code in 11 U.S.C. § 101(10) to mean:
(10) `custodian' means 
(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;
(B) assignee under a general assignment for the benefit of the debtor's creditors; or
(C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors;[13]
11 U.S.C. § 543 (1983) provides in pertinent part:
(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

*347 (b) A custodian shall 
(1) deliver to the trustee any property of the debtor transferred to such custodian, or proceeds of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
(2) file an accounting of any property of the debtor, or proceeds of such property, that, at any time, came into the possession, custody, or control of such custodian.
Accordingly, it appears that the trustee would be entitled to possession of the fund to the extent that it is not the proceeds of fraud unless the Court, upon notice and hearing, were to determine that the interests of creditors would be better served by permitting a custodian to continue possession, custody or control of the property. See 11 U.S.C. § 543(d).[14]
However, other material, unaddressed questions of fact and law will require determination in order to resolve the ultimate issue in this case, even if the trustee succeeds in establishing an interest of the estate in the fund. 11 U.S.C. § 543 requires that the Court, upon notice and hearing, protect all entities to which a custodian has become obligated with respect to property turned over to a bankruptcy trustee. See 11 U.S.C. § 543(c)(1) (1983).
Was Wiese & Cox obligated to rescinding growers with respect to the fund it held? The obligation to refund purchase money to rescinding growers was contractual and became obligations of the Debtor to individual growers upon their acceptances of the rescission offers. The offers made no mention of an escrow fund to satisfy those individual obligations. There is no document before the Court that can be considered an escrow agreement obligating a custodian of the fund to the growers in any manner.[15] Nevertheless, did rescinding growers become vested beneficiaries of the fund upon their individual acceptances of the offers; and are they then entities to whom the custodian became obligated with respect to the fund? How does the circumstance of apparent impossibility of performance affect the Debtor's agreements with the State and the individual rescinding growers with respect to the entire matter of rescission?
None of these questions have been addressed in the context of the present motions for summary judgment.

V.
It is apparent from the motions and memoranda of counsel that the issue sought to be resolved by summary judgment is whether the fund in dispute should be available for distribution pro rata to all creditors of the Debtor's estate or only to those growers who elected to rescind their agreements with the Debtor pursuant to the prepetition Assurance of Discontinuance Agreement entered between AEFS and the State.[16] Whether the estate has an interest in the fund, and, if so, which creditors or entities are entitled to participate in its distribution, involve questions of material, unresolved fact and unaddressed law. The issue is not suitable for summary judgment upon the present record.
The issue of whether transfer of the fund to Wiese & Cox constituted a transfer avoidable by the trustee under 11 U.S.C. § 547 is suitable for summary judgment. *348 The trustee cannot prevail on the issue regardless of whether the funds or any part are proceeds of fraud.
ACCORDINGLY, IT IS HEREBY ORDERED:
1. The trustee's motion for summary judgment that the prepetition transfer to Wiese & Cox by AEFS of an escrow fund in the amount of $500,000.00 in compliance with the Assurance of Discontinuance Agreement with the State of Minnesota was a preferential transfer avoidable by the trustee under 11 U.S.C. § 547 is denied.
2. The State's motion for summary judgment that the prepetition transfer to Wiese & Cox by AEFS of an escrow fund in the amount of $500,000.00 in compliance with the Assurance of Discontinuance Agreement with the State of Minnesota, was not a preferential transfer avoidable by the trustee under 11 U.S.C. § 547 is granted. Let Judgment Be Entered Accordingly.
3. The trustee's motion for summary judgment that the escrow fund held by Wiese & Cox at commencement of the case pursuant to the Assurance of Discontinuance Agreement between AEFS and the State of Minnesota is property of the estate, is denied.
4. The trustee shall continue to hold said fund in a separate, interest bearing account pending determination of entitlement by this Court upon trial of material issues of fact and resolution of issues of law consistent with this Order.
NOTES
[1] The Jerusalem artichoke is a species of sunflower which produces a tall, leafy stalk and an underground tuber. It should not be confused with the artichoke commonly available in retail food stores and eaten as a vegetable.
[2] Apparently, these figures relate only to Minnesota and Iowa. The State recites in its brief that total sales prior to bankruptcy involved 2,000 growers and an amount of $25,000,000.00 throughout the United States.
[3] More than one-half of the first year's sales in excess of $5,000,000.00 was made to growers who were Minnesota residents.
[4] The Assurance of Discontinuance Agreement was approved by the Ramsey County District Court on March 24, 1983.
[5] No explanation has been furnished the Court why this provision was not included in the Assurance of Discontinuance Agreement itself. The letter also sets forth in greater detail the manner in which the rescission offers were to be handled. No evidence is before the Court that any provisions of the March 22, 1983, letter were considered by the state district court and made part of the order approving the Assurance of Discontinuance.
[6] The stipulation of facts filed by the parties is confusing as to the actual withdrawals from and deposits into the trust after the account was established on April 15, 1983. Paragraph 4 recites that the original funds, as replenished by the $120,607.00, together with accrued interest, is the fund in dispute here. However, paragraph 6 recites that from April 11, 1983, through April 28, 1983, the rescission requests were received from 50 growers totalling $627,639.00, and that refund checks were issued to these growers between April 22, 1983, and May 11, 1983.
[7] The Assurance of Discontinuance Agreement recites that it is not to be considered an admission of any violation of Minnesota law "for any purpose whatsoever". Furthermore, the record discloses no adjudication of fraud on the part of AEFS or its principals. An allegation is made, however, by the State in its answer to the complaint that the fund constitutes the proceeds of fraud. Accordingly, since the trustee has conceded the issue for purposes of his motion, the Court will determine the motion based upon the fraud premise.
[8] The Bankruptcy Amendments and Federal Judgeship Act of 1984 amended § 547(b) deleting "property of the debtor" and inserting in its place "an interest of the debtor in property". Because the amendment is applicable only to cases filed after October 8, 1984, the 1983 version is cited here.
[9] See especially, Independent Clearing House for an exhaustive review and treatment of the question.
[10] The trustee did not allege fraud in the complaint and conceded fraud only for purposes of his motion for summary judgment. The State alleged as an affirmative defense in its answer that the disputed money was obtained by the Debtor through fraud. However, there has been no such finding by the Court.
[11] The State did not move for summary judgment on the issue of whether the fund is § 541 property of the estate. Even if it had, a genuine issue of material fact exists rendering the issue unsuitable for summary judgment. In Chambers v. McLean Trucking Co., Inc., 550 F.Supp. 1335 (M.D.N.C.1981), the Federal District Court for the District of North Carolina, observed:

That both sides to a case have moved for summary judgment does not change the normal standards for judging such motions. It does not establish the absence of genuine issues of fact or require the Court to grant judgment to one side or the other. The Court must consider each motion separately to see if no genuine issue of material fact exists. Neither side concedes the truthfulness of its adversaries' evidence other than for the purposes of its own motion. The nonmoving side as to each motion is entitled to all inferences which may arise from the evidence. In re Chambers v. McLean Trucking Co., 550 F.Supp. 1335, 1938 (M.D.N.C.1981).
Accordingly, the assumption that the fund is the proceeds of fraud for purposes of the trustee's motion for summary judgment does not determine the issue for purposes of resolving the case outside the context of that motion. The question whether the fund consists of fraud proceeds remains an issue in the case and must be litigated.
[12] Even fraud be proved, absent the trustee's concession that the fund is entirely proceeds of fraud, fraudulently obtained money must be traced into the fund or it must be shown that the money in the fund could not have come from any source other than the Debtor's receipt through fraud in order to defeat the trustee's claim as against the claims of defrauded parties. If the ultimate determination of this issue in the case is adverse to the trustee, he will be required to distribute the fund, as would the prepetition trustee Wiese & Cox, under the supervision of the Ramsey County District Court pursuant to the Assurance of Discontinuance.
[13] Absent fraud, growers became creditors of the Debtor after the transfer when they accepted the rescission offers.
[14] Since the fund has already been transferred to the trustee pursuant to stipulation of the parties and the transfer has been approved by the Court, it is unlikely that the fund would be transferred back to a custodian.
[15] The only reference to the fund arising out of the Assurance of Discontinuance Agreement that can be found in documents before the Court is in paragraph 10 of a March 22, 1983, confirmation letter from the State to Wiese & Cox which reads:

A.E.F.S. will maintain an escrow account of $500,000 for purposes of honoring requests for rescission which are made in a timely manner in accordance with the A.E.F.S. rescission offer.
[16] The stipulation of the parties providing for possession of the fund by the trustee evidences concern of the State, not as to who distributes the fund, but to whom it is distributed.