Keith MEYER, as Special Administrator
of the Estate of Herman E. Meyer,
Deceased, Plaintiff and Appellee,

v.

James KNEIP, Kneip–Meyer, Inc., and
KMI Partnership, Defendants
and Appellants.

No. 16614.

Supreme Court of South Dakota.

Argued Nov. 28, 1989.

Decided June 6, 1990.

Charles L. Dorothy, Sioux Falls, for plaintiff and appellee.

Carleton R. Hoy, James L. Hoy of Hoy & Hoy, Sioux Falls, for defendants and appellants.

ZINTER, Circuit Judge.

James F. Kneip (Kneip) appeals from the imposition of a constructive trust upon property which the trial court found Kneip obtained through undue influence. Kneip contends the suit was barred by a six year statute of limitations. We disagree and affirm the trial court.

A lengthy chronology of the events leading up to the commencement of this action is required. Herman E. Meyer (Meyer) was born in 1898. Through hard work, frugal living and prudent investing he accumulated substantial real estate, stocks, bonds and other personal property.

In 1968 Meyer became acquainted with Brookings attorney Thomas Martin (Martin). Meyer became Martin's client, friend and business associate. From 1968 to 1978 Martin and Meyer entered into many real estate transactions financed principally by Meyer. Martin also prepared a will for Meyer. The will provided that Martin would be the executor of Meyer's estate and would also act as a paid manager of much of Meyer's property for a period of 20 years after Meyer's death. The trial court found that the transactions between Martin and Meyer were substantially in

Martin's favor and were an indication of Meyer's susceptibility to undue influence prior to the time Meyer met Kneip.

Meyer separated from his second wife in 1974 at the age of 75. Prior to the separation Meyer was a well-groomed businessman who lived in a clean, well-kept home in Brookings. After the separation Meyer's personal appearance and the condition of his home deteriorated. In the late 1970's and in the 1980's Meyer rummaged through dumpsters for food. He also accumulated so much junk in and around his home that the first of several nuisance complaints was filed against him in 1977. Meyer's living conditions continued to deteriorate to the point where he lived in virtual squalor. Garbage and junk, stacked in places to within one foot of the ceiling in his home, was separated by pathways to allow passage from room to room.

In the spring of 1978, Meyer, then 79 years of age, sought professional financial assistance from Kneip, a licensed stockbroker. Meyer asked Kneip to organize his stock and bond portfolio. Over the next two years Kneip examined and organized Meyer's stocks and bonds. During this period of time Meyer was in Kneip's office almost daily. On several occasions Kneip also provided Meyer assistance in Meyer's home where Kneip observed Meyer's living conditions.

Kneip found Meyer's financial records in disarray. Negotiable bonds were found in cardboard boxes along with junk mail and other inconsequential papers. Meyer kept no record of which bonds matured and which bonds defaulted. Kneip found unopened social security checks, undeposited bond interest checks and matured bonds that were not presented for payment.

In the process of organizing Meyer's securities Kneip also discovered and documented Meyer's real estate transactions with Martin. In talking with Meyer, Kneip learned that Meyer did not recall that he had signed large notes and pledged his securities in some of the real estate transactions with Martin.

In 1981 Meyer approached Kneip and suggested that they enter into an agreement where they would both invest securities and Kneip would manage the investments. Kneip responded that he was not interested in managing Meyer's investments unless they formed a business where Kneip could start out as an equal partner.

Kneip consulted Sioux Falls attorney Lawrence Anthony Weisensee (Weisensee) to devise a business structure that would fulfill Kneip's goals. After the terms of the proposed business arrangement were worked out, Weisensee referred Meyer to John Burke (Burke), another Sioux Falls attorney. The terms of the arrangement did not require any capital contribution from Kneip and were very favorable to Kneip. Burke wrote a letter to Meyer on June 12, 1981, in which Burke outlined the details of the proposed arrangement and advised Meyer that "I have not been asked my opinion as to the wisdom of this program because it was a program that you brought to me and asked me to do the necessary legal work to effectuate it."

On June 26, 1981, Kneip, Weisensee and Meyer met in Burke's office where Kneip and Meyer formed a corporation and partnership. Kneip–Meyer, Inc. was capitalized with Meyer's stocks having a cost basis of approximately $280,000. Meyer received 280,000 shares for his contribution of the stock and Kneip received 31,000 shares for his contribution of time and labor in organizing Meyer's stocks.

To obtain a one-half interest in the corporation Kneip was to simultaneously purchase from Meyer an additional 125,000 shares in return for a promissory note in the amount of $160,000 with annual payments over ten years at five percent interest. Although the transfer was to be made on June 26, 1981, the record is not clear when the transfer actually occurred. The corporate minutes do not reflect the stock transfer took place until an August 8, 1985, special meeting of the shareholders when Meyer and Kneip retroactively ratified the transfer.

Kneip and Meyer held the first meeting of the board of directors on June 26, 1981. At the meeting, the board authorized Kneip to be paid a salary of $4,000 a month,

retained Weisensee as general counsel, and adopted a resolution allowing either stockholder to make yearly purchases of up to 50,000 shares of the capital stock of the corporation for 25 percent of its actual value. In 1982 and 1983 this stock option was exercised by Kneip and was declined by Meyer.

On June 26, 1981, Meyer and Kneip also formed a limited partnership known as KMI Partnership. KMI Partnership was capitalized with Meyer's bonds having a cost basis of more than $1,000,000. Meyer, the limited partner, received nineteen units (ninety-five percent) of the limited partnership in exchange for his bonds. Kneip, the general partner, received one unit in exchange for his management of the bonds. In order to obtain a one-half interest in the partnership Meyer agreed to sell Kneip nine of Meyer's partnership units on an installment contract in exchange for a promissory note in the amount of $313,165 with ten annual payments at five percent interest.

Burke never attended another formal meeting of the corporation or partnership and had little contact with Meyer concerning the businesses until this suit was filed. Burke did, however, remain involved with Kneip, Meyer and Weisensee in regard to Meyer's estate planning.

Although Kneip made no withdrawals from the businesses in 1981, he began withdrawing substantial sums of money from the business in 1982. Over the next few years Kneip and some of his family members wrote checks on the business accounts for personal items such as a home in California, a customized van, two airplanes, flying lessons for Kneip's son, personal medical expenses and credit card bills. Kneip also withdrew $48,000 a year from Kneip–Meyer, Inc. and obtained one of Meyer's KMI Partnership units each year as a management fee. Finally, Kneip paid Weisensee $44,575 with business funds even though Weisensee was convicted of willful failure to file federal income tax returns and was suspended from the practice of law in this state.[1] Kneip paid some of those funds to Weisensee while Weisensee was in a federal penitentiary.

In addition to making these withdrawals, Kneip did not use his own personal funds to make his loan payments to Meyer for the nine units of KMI Partnership and the 125,000 shares of Kneip–Meyer, Inc. Instead of using his own funds, Kneip merely debited his artificially inflated capital account and credited Meyer's capital account on the books of the partnership for each yearly payment.

Burke, without Meyer's knowledge, complained to Kneip that this system of bookkeeping was depleting Meyer's estate. As a result of the complaint Kneip created the Herman E. Meyer Fund Account in KMI Partnership which was to be Kneip's personal obligation. Kneip then debited his capital account and credited Meyer's fund account for Kneip's obligations to Meyer on the loans and for Kneip's personal expenditures.

In January of 1983 Meyer contributed additional bonds to KMI Partnership. At that time Kneip and Meyer amended the Articles of Limited Partnership to provide that such capital advances in excess of the initial capital contribution were not to be considered capital contributions but were loans to the partnership to be repaid at the discretion of Kneip.

In December of 1984, Kneip took Meyer to California to stay with Meyer's sister. At that time Weisensee practiced law in California. Burke received calls from Kneip and Weisensee requesting a change in Meyer's will to make a small provision for Meyer's sister. Burke drew a new will and sent it to California for execution. Just before undergoing surgery in California Meyer executed the new will. The will, however, contained a provision which was not in the one Burke drafted. The new provision, executed by Meyer in the presence of Weisensee's secretary, forgave Kneip of any obligation he had to Meyer for the purchase of the stock in Kneip–Meyer, Inc. and the units of KMI Partnership.

On October 6, 1986, Kneip and Meyer executed another amendment to the arti-

**1.** *See In the Matter of the Discipline of Lawrence* *Anthony Weisensee,* 334 N.W.2d 505 (S.D.1983).

cles of KMI Partnership. Although Burke prepared an amendment which, among other things, provided that upon Meyer's death Kneip was to pay the obligation under the Herman E. Meyer Fund to Meyer's estate, the amendment which Kneip obtained from Meyer provided that Meyer's fund account was transferred to the partnership as a gift.

On November 12, 1986, Meyer injured his knee and was hospitalized. Although Meyer wanted to return to his home after he recovered, Meyer moved to a nursing home because his home was unfit for habitation and Meyer's mental condition had deteriorated to the point where he was suffering from dementia.[2]

In 1987, Kneip, Burke and Martin became engaged in a series of power of attorney and will changes. On June 18, 1987, five years and 357 days after formation of the businesses, Martin obtained a power of attorney from Meyer, and Martin began investigating Kneip's transactions with Meyer. Kneip, however, refused to provide Martin with any information concerning Kneip and Meyer's business dealings. Kneip also convinced Meyer to cancel Martin's power of attorney.

On August 17, 1987, Kneip checked Meyer out of the nursing home for an hour and 30 minutes for ice cream. On this occasion Meyer and Kneip held a special meeting of the partners of KMI Partnership. At that meeting Meyer exchanged his fund account, then worth $765,715, for Certificates of Accrual on Treasury Securities having a face value of $758,000. The certificates, however, were zero coupon bonds which, because they paid no principal interest until maturing in the years 2002 and 2007, were purchased by Kneip with KMI Partnership funds for $138,000.

On September 15, 1987, Burke wrote to Kneip advising him that he had discovered some improprieties in Kneip's transactions with Meyer. Burke demanded that Kneip place the stocks and bonds in a third-party custody account until the matter could be resolved. Burke requested an accounting and indicated he would be requiring liquidation of the corporation and some fair settlement. Kneip refused and Burke commenced this suit.

After the suit was commenced Burke withdrew and Meyer's new counsel filed an amended complaint seeking imposition of a constructive trust. After a lengthy trial, the trial court found:

1. That when Meyer sought professional assistance from Kneip in 1978 Meyer was mentally infirm, had few acquaintances other than Kneip and Martin, and was susceptible to undue influence;

2. That Meyer looked up to and respected Kneip, and that a confidential relationship existed between them since 1978;

3. That from 1978 to 1987 there were frequent contacts between Kneip and Meyer;

4. That Kneip dominated the confidential relationship and exercised undue influence over Meyer in his dealings with Meyer to the substantial benefit of Kneip and detriment of Meyer; and

5. That Kneip unduly profited from the exercise of undue influence because Kneip's business agreements with Meyer were merely a vehicle by which Kneip could obtain Meyer's assets without contributing anything of value other than his time.

The trial court concluded that Kneip should be declared a constructive trustee of the assets of KMI Partnership and Kneip–Meyer, Inc. and of the assets Kneip withdrew from the businesses over and above a reasonable management fee.

This suit was commenced on September 23, 1987. Kneip argues that Meyer's suit for the imposition of a constructive trust must have been commenced under SDCL 15–2–13(1), (2) or (4) within six years after the date the cause of action accrued. Kneip claims Meyer's cause of action ac-

---

**2.** Meyer's physician described dementia as a clinical state in which there is a loss of retention of memory and other intellectual cognitive functions, that is, inability to learn, remember, calculate, make appropriate deductions from given premises and reason abstractly due to chronic degenerative disease of the brain.

crued on June 26, 1981, the day KMI Partnership and Kneip–Meyer, Inc. were formed. We disagree.

## DECISION

A constructive trust may be imposed against one who wrongfully acquires property through undue influence. SDCL 55–1–8. Conceptually, the doctrine of constructive trust is remedial and flexible. *Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259, 264 (S.D.1988). The doctrine allows courts to avoid and prevent unjust enrichment. *Id.*

In cases of constructive trust, "the statute of limitations 'begins to run from the time the act was done by which the party became charged as constructive trustee.'" *Rosebud Sioux Tribe*, 432 N.W.2d at 263 (*quoting Johnson v. Graff*, 71 S.D. 231, 23 N.W.2d 166, 168 (1946)). A constructive trust is created by operation of law and arises at the time of the wrongful acquisition. *Johnson*, 23 N.W.2d at 168; *See also City of Centerville v. Turner County*, 25 S.D. 300, 126 N.W. 605 (1910). Stated another way, the trust relation arises when the constructive trustee acquires title. *Stianson v. Stianson*, 40 S.D. 322, 167 N.W. 237, 238 (1918).

Although KMI Partnership and Kneip–Meyer, Inc. were created six years and three months prior to the commencement of this suit, it was the corporation and partnership, not Kneip, that acquired title to Meyer's assets on June 26, 1981. The formation of the businesses only created a mechanism by which Kneip subsequently obtained title to business property through personal withdrawals, internal bookkeeping, management fees and stock options. By those acts, Kneip obtained $968,155 from the businesses from January 1, 1982, through December 31, 1987. Had Kneip's system of bookkeeping and withdrawals continued from 1982 until 1991, he would have acquired title to a one-half interest in Kneip–Meyer, Inc. and all of KMI Partnership without any contribution of his own funds.

Furthermore, Kneip did not obtain Meyer's nine partnership units and 125,000 shares of stock in accordance with the terms of the original agreements entered into on June 26, 1981. Under the original agreements, Kneip's right to the stock and partnership units was conditioned on his obligation to repay the personal loans to Meyer. Kneip, however, avoided payment of those loans through internal bookkeeping, business agreements, amendments to the Articles of Limited Partnership and will changes which occurred between 1982 and 1987.

Because Kneip acquired virtually all of the property [3] after 1981 by acts occurring after 1981, the suit was not barred by the statute of limitations.

We have examined Kneip's other contentions on appeal and find them without merit.

WUEST, C.J., MORGAN, and HENDERSON and MILLER, JJ., concur.

ZINTER, Circuit Judge, for SABERS, J., disqualified.

---

**3.** Although Kneip did obtain a relatively small unencumbered interest in the businesses on June 26, 1981, for his management services, the trial court allowed Kneip to retain a reasonable management fee.