**In re Ronald Marion WALGAMUTH and Karla Kay Walgamuth, Debtors.**

**ESTATE OF Oliver F. HANSON, a/k/a Oliver Hanson, Plaintiff,**

v.

**Ronald Marion WALGAMUTH and Karla Kay Walgamuth, Defendants.**

**Bankruptcy No. 91–50270–INH. Adv. No. 91–5018–INH.**

United States Bankruptcy Court, D. South Dakota.

Sept. 8, 1992.

Wesley W. Buckmaster, Belle Fourche, S.D., for plaintiff.

Ramon A. Roubideaux, Rapid City, S.D., for defendants, debtors.

## MEMORANDUM OF DECISION RE: COMPLAINT TO DETERMINE DISCHARGEABILITY OF A DEBT AND FOR THE IMPOSITION OF A CONSTRUCTIVE TRUST

IRVIN N. HOYT, Chief Judge.

The matter before the Court is a complaint filed by the Estate of Oliver Hanson to determine the dischargeability of a debt and for the imposition of a constructive trust. This is a core proceeding under 28 U.S.C. § 157(b)(2). This ruling shall constitute Findings and Conclusions as required by F.R.Bankr.P. 7052.

### I. DISCHARGEABILITY OF DEBT TO PLAINTIFF

A. *Facts.*

Debtors Ronald M. and Karla K. Walgamuth filed their Chapter 7 petition on August 21, 1991. The original date set for Debtors' § 341 meeting was October 3, 1991. Pursuant to F.R.Bankr.P. 4007(c), the last date for filing a complaint objecting to the dischargeability of a debt under 11 U.S.C. § 523(c) was "not later than 60 days following the first date set for the meeting of creditors held pursuant to § 341(a)" or, in this case, December 2, 1991. The Bankruptcy Clerk of Court served notice of this last date for filing

such objections on August 21, 1991, which was not less than thirty days notice of the last date for filing such objections as required by F.R.Bankr.P. 4007(c).

Plaintiff Estate of Oliver Hanson (Hanson Estate) filed a complaint under 11 U.S.C. §§ 523(a)(2), (4), and (6) on December 16, 1991 objecting to the dischargeability of a certain debt for fraudulent acts or willful and malicious injury by Debtors and asking that a constructive trust be placed on some estate and exempt property. Debtors filed an answer generally denying the allegations and further stated, "That said complaint is untimely. That debtors have been discharged as of December 19, 1991." Trial was set for February 24, 1992. Each party filed a pre-trial memorandum in support of their respective positions. Neither party's memorandum specifically addressed whether the complaint was timely.

A trial was held February 24 and 25, 1992. Appearances included Wesley W. Buckmaster and Terry G. Westergaard for Plaintiff–Hanson Estate and Ramon A. Roubideaux for Defendants–Debtors. Chapter 7 Trustee Dennis C. Whetzal was allowed to intervene by stipulation of the other parties but did not actively participate. After the trial, each party filed proposed findings of fact and conclusions of law. Again, neither Plaintiff's nor Defendants–Debtors' respective proposed findings and conclusions addressed whether the complaint was timely filed.

The Court, after noting that the complaint was not filed on or before the December 2, 1991 deadline, ordered each party to file a memorandum of law on whether the deadline for filing dischargeability complaints established by F.R.Bankr.P. 4007(c) is jurisdictional or can be modified by equitable considerations such as estoppel, waiver, or equitable tolling and, if those equitable considerations apply, whether Defendants–Debtors waived the timeliness issue at trial. The matter was taken under advisement after receipt of the memorandums and the resolution of the objections to exemptions filed by the Hanson Estate and Trustee.

B. *Discussion.*

■ The deadline for filing a dischargeability complaint is established by rule and that date coincides with the entry of discharge. Under F.R.Bankr.P. 4007(c), a complaint objecting to the dischargeability of a debt for fraud or willful and malicious injury—set forth at §§ 523(a)(2), (4), or (6)—must be filed within sixty days after the date originally set for the § 341 meeting of creditors unless an extension is granted before the original deadline passes. Correspondingly, under F.R.Bankr.P. 4004(c), discharge shall be entered "forthwith" upon the expiration of sixty days following the first date set for the § 341 meeting of creditors.

■ Upon a careful review of Rule 4007(c) and applicable dates in this case, the Court concludes that the complaint was untimely. Plaintiff did not file a motion under F.R.Bankr.P. 4007(c) to extend the time for filing a complaint objecting to the dischargeability of a debt. Therefore, the last date for filing an objection to the dischargeability of a debt in this case was December 2, 1991—sixty days after the originally scheduled § 341 meeting on October 3, 1991. Since Plaintiff missed that deadline by several days and did not request an extension of the deadline, judgment will be entered for Defendants–Debtors on the issue of the dischargeability of the debt to Plaintiff.

■ While the Court of Appeals for the Eighth Circuit has not ruled on this issue, this Court agrees with that line of cases, including some from other Bankruptcy Courts in this Circuit, which concludes that the deadline in Rule 4007(c) for filing dischargeability complaints under § 523(a)(2), (4), or (6) must be strictly enforced unless a timely extension of time to file is obtained under Rule 4007(c). *Byrd v. Alton (In re Alton)*, 837 F.2d 457, 459 (11th Cir.1988); *Neeley v. Murchison*, 815 F.2d 345 (5th Cir.1987); *In re Hobbs*, 141 B.R. 466, 467–68 (Bankr.N.D.Ga.1992); *Peoples Savings & Loan Co. v. Legge (In re Legge)*, 138 B.R. 188, 189 (Bankr.S.D.Ohio 1991); *Stanley v. Cole (In re Cole)*, 136 B.R. 453, 456

(Bankr.N.D.Tex.1992); *In re White*, 133 B.R. 206, 208 (Bankr.S.D.Ind.1990); *Haga v. National Union Fire Ins. Co. (In re Haga)*, 131 B.R. 320, 326 (Bankr.W.D.Tex. 1991); *Brown v. Barley (In re Barley)*, 130 B.R. 66, 68–69 (Bankr.N.D.Ind.1991); *O'Shaughnessy v. Peacock (In re Peacock)*, 129 B.R. 290, 291–92 (Bankr. M.D.Fla.1991); *Toledo Teachers Credit Union v. Ezell (In re Ezell)*, 116 B.R. 556, 557 (Bankr.N.D.Ohio 1990); *Lee Ludwig & Assocs., Inc. v. Seasport, Inc. (In re American Sport Innovations ("ASI"))*, 105 B.R. 614, 616 (Bankr.W.D.Wa.1989); *Anderson v. Booth (In re Booth)*, 103 B.R. 800, 801–02 (Bankr.S.D.Miss.1989); *In re Snyder*, 102 B.R. 874 (Bankr.S.D.Fla.1989); *In re Ford*, 87 B.R. 641, 644 (Bankr.D.Nev.1988); *Austin Farm Center, Inc. v. Harrison (In re Harrison)*, 71 B.R. 457, 459 (Bankr. D.Minn.1987); *Waszkiewicz v. Tuzzolino (In re Tuzzolino)*, 71 B.R. 231, 232–33 (Bankr.N.D.N.Y.1986); *Roberts v. Dotson (In re Dotson)*, 68 B.R. 37, 38–39 (Bankr. W.D.Mo.1986); *F.D.I.C. v. Kirsch (In re Kirsch)*, 65 B.R. 297, 300–01 (Bankr. N.D.Ill.1986); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Tatum (In re Tatum)*, 60 B.R. 335, 337 (Bankr.D.Colo.1986); *New York State Department of Social Services v. Perrin (In re Perrin)*, 55 B.R. 401, 403 (Bankr.D.N.D.1985); *Edwards v. Whitfield (In re Whitfield)*, 41 B.R. 734, 736 (Bankr.W.D.Ark.1984); *Bradco Supply Corp. v. Lane (In re Lane)*, 37 B.R. 410, 414 (Bankr.E.D.Va.1984); *contra In re Santos*, 112 B.R. 1001 (9th Cir. BAP 1990) (cases cited therein). *See South Dakota Cement Plant v. Jimco Ready Mix Co.*, 57 B.R. 396 (D.S.D.1986) (clerk must give creditor notice of dischargeability complaint deadline before sixty day objection period begins to run); *contra Walker v. Wilde (In re Walker)*, 927 F.2d 1138 (10th Cir.1991) (actual, not formal, notice of dischargeability complaint deadline is sufficient); *Sanchoz Ramos v. Compton (In re Compton)*, 891 F.2d 1180 (5th Cir.1990) (actual, not formal, notice of dischargeability complaint deadline is sufficient). *See also F & M Marquette National Bank v. Richards*, 780 F.2d 24 (8th Cir.1985) (conversion from Chapter 11 to Chapter 7 proceeding creates new sixty-day period to file dischargeability complaints under Rule 4007(c)); *Industrial Financial Corp. v. Falk (In re Falk)*, 96 B.R. 901, 905–05 (Bankr.D.Minn.1989) (local rule extending time to file dischargeability complaint is invalid).

## II. IMPOSITION OF CONSTRUCTIVE TRUST

### A. Facts.

Ronald Walgamuth began working for Oliver Hanson on Hanson's ranch east of Sturgis, South Dakota in December, 1970 after Walgamuth was discharged from the Army. Walgamuth performed general ranch work for Hanson including tending to a cattle herd, fixing fence and equipment, and doing some haying. He generally worked from 7:00 a.m. until 10:00 a.m. plus additional hours as needed during busy seasons such as calving. Walgamuth was employed continually by Hanson for the next nineteen years except for one summer when Walgamuth quit following a dispute with Hanson about a pickup.[1] Walgamuth sometimes had other jobs in addition to his job with Hanson. Walgamuth had a good reputation in the community.

Hanson lived alone on the ranch. Relatives and neighbors visited occasionally. Hanson was known as an honest, law-abiding, frugal person who kept to himself. Hanson's house on the ranch did not have a sewer system or running water. The ranch was a solvent business.

Hanson's ranch had 5,000 acres of land including 500 to 600 acres for hay. Approximately 1,000 acres of pasture were leased out. The remainder was used to pasture Hanson's herd of beef cattle. In 1985, Hanson had around two hundred beef cows,[2] one retired horse, and four young or

---

1. Walgamuth was employed seasonally the first year.

2. Neither party presented any concise evidence on the size of Hanson's cow herd. There was some testimony that Hanson ran about two hundred head of cows and that he kept some steers until they were yearlings or two- and three-year

green broke horses. Walgamuth did not have any horses or cattle on Hanson's ranch. Neighbors generally put up Hanson's hay on shares but in the mid–1980's Hanson purchased additional equipment so that Walgamuth could put up more, but not all, of the ranch's hay. Neighbors and Walgamuth's friends helped with branding and hauling hay bales; some were compensated for their help.

In 1980, Walgamuth earned $350.00 per week. By 1986 he was paid $425.00 per week. At the time his employment was terminated in late 1990, Walgamuth's weekly wage was $475.00. During Walgamuth's employment, Hanson made loans to Walgamuth but Hanson did not always accept repayment. Hanson also gave Walgamuth a bonus at Christmas of less than $1,000.00. The community consensus was that Hanson trusted and worked well with Walgamuth.

Walgamuth did not maintain the ranch's financial records nor handle its business affairs independent of Hanson. Hanson did not have Walgamuth pay ranch expenses and then reimburse him. Occasionally Hanson would have Walgamuth purchase personal items for him in town and then reimburse Walgamuth when he brought the items to the ranch.

In September, 1985, Hanson, then about 87 years of age, entered a local nursing home on the advice of his physician due to medical problems and the need for better general care and nutrition. Walgamuth's employment at the ranch continued and his responsibilities increased although no major changes were made in the ranch operation. He generally spent daylight hours there and occasionally stayed overnight during calving or to deter trespassers and thieves.

Beginning in September, 1985, Walgamuth wrote checks for Hanson's signature for ranch expenses. He also kept annual farm journals of the ranch's income and expenses. Walgamuth gave an accountant the annual farm journals so that the accountant could prepare Hanson's tax returns. Walgamuth had some ranch records in his possession; he said Hanson kept the rest in his nursing home room. A fiduciary relationship between Walgamuth and Hanson was created.[3]

Walgamuth visited Hanson almost every day in the nursing home. During these visits, the men would discuss ranch affairs and Walgamuth would sometimes tend to Hanson's personal needs such as giving him haircuts, getting his mail, and depositing funds Hanson earned on investments. Occasionally during the first few years of Hanson's residency in the nursing home, Walgamuth would take Hanson to the ranch for visits. For a few years, Hanson talked about returning to the ranch to live but he never did. Hanson's eyesight was hampered by cataracts by the fall of 1987 and he did not receive remedial treatment for them. Walgamuth said he and Hanson talked about Walgamuth's future in 1988 or 1989. Hanson told Walgamuth that Walgamuth would not have to "worry about working" but Hanson said nothing specific regarding an inheritance, gift, or sale of the ranch from Hanson to Walgamuth.

In the fall of 1988 after extensive remodeling, Walgamuth and his family of four—a teen-age daughter and two younger sons plus his wife, Karla—moved into Hanson's ranch house. They did not pay rent during their occupancy.

In June of 1990, Walgamuth contacted attorney Bryce Flint regarding a power of attorney for Walgamuth from Hanson. The city of Sturgis wanted to purchase some of Hanson's land for an airport. The purpose of the power of attorney was to allow Walgamuth to represent Hanson's interests with the city. At Walgamuth's request, Flint prepared the necessary documents. They planned to visit Hanson early in the day to get the necessary signature because Walgamuth told Flint that Hanson had good days and bad days but that he was generally better in the mornings. Flint and Walgamuth visited Hanson on

olds. A large cull in the cow herd, approximately 130 head, was made in 1988.

3. This fact was conceded by Debtors' counsel at trial.

June 12, 1990. Flint read the power of attorney document to Hanson. Although Flint found Hanson was quite feeble, he was satisfied that Hanson understood the purpose of the power of attorney and wanted it to be executed. Flint observed that Hanson and Walgamuth had a father-son like relationship and that Hanson had complete confidence in Walgamuth. Hanson signed the power of attorney that day. Walgamuth never utilized it, however.

Hanson's nephew, Charles E. Jordan, filed a guardianship petition for Hanson in July, 1990 due to his concerns about Hanson's health and the management of Hanson's business affairs. Lawrence L. Massa, D.O., supplied an affidavit dated June 26, 1990 that said on June 12, 1990 he had diagnosed Hanson, then about 92 years of age, as

> suffering from mental and physical infirmities that are irreversible as a result of the aging process. That Oliver Hanson suffers from material deficits in memory and other cognitive functions such that he has become so impaired that it is not possible for him to care for himself or to handle either his personal or financial affairs.

Dr. Massa also stated that Hanson had recently been difficult for nursing home staff to handle and had knocked down a fellow patient. Walgamuth said he learned of the petition when Hanson showed it to him on or prior to August 2, 1990. By Order of the state Circuit Court for the Eighth Judicial Circuit[4] entered August 13, 1990, Charles E. Jordan was appointed guardian of Hanson's person and Norwest Bank South Dakota, N.A., Investments and Trust Department, was appointed guardian of Hanson's estate. The court ordered Norwest to conduct an inventory of Hanson's estate within sixty days and to render an account to the court every three months.

Pursuant to a routine marshaling of assets, Norwest trust officer Gerald Gerdes met with Walgamuth on August 14, 1990 to obtain Hanson's financial records that were in Walgamuth's possession. Norwest's audit of these records indicated all bank statements and some deposit slips were missing. Gerdes subsequently obtained some bank statements from Walgamuth. Other bank statements for 1986 through August, 1990 were obtained directly from Hanson's banks. When Norwest compared the bank statements to the cancelled checks, it found that ninety-seven checks written in 1987, 1988, 1989, and 1990 were missing. Norwest obtained copies of these missing checks from the two banks where Hanson had checking accounts. Of these ninety-seven checks, Walgamuth was the payee on ninety-five of them. The payees on one of the remaining two missing checks were Walgamuth's children. The other check was for $2,000.00 made payable to Crago Cattle Company and was never cashed. None of the ninety-five checks to Walgamuth were for his regular salary.

Walgamuth's employment was terminated December 1, 1990. He and his family moved from the Hanson ranch to a new home in Whitewood, South Dakota.

Norwest's initial audit prompted it to obtain Walgamuth's financial records, including Walgamuth's tax returns for 1986 through 1989, bank statements, and financial statements. All ninety-five checks from Hanson to Walgamuth had been deposited in Walgamuth's account at First Western Bank of Sturgis. Some deposits to Walgamuth's account from the ninety-five checks were "less cash." Only one check was reflected in the appropriate year's farm journal for Hanson's ranch.[5] None of these expense checks were reflected in Hanson's tax returns. Some checks were reflected in Walgamuth's tax returns.

---

4. The Hon. Scott C. Moses, presiding.

5. The 1988 farm journal contained an expense entry on October 20, 1988 of $12,285.00 for a baler. A check dated October 14, 1988 for $16,-377.00 was drawn on Hanson's First Western account for a baler. A check dated October 17, 1990 for $12,285.00 was drawn on Hanson's Norwest account for 21 hereford cows. An expense for $16,377.00 was not recorded in the 1988 farm journal.

Norwest sold Hanson's livestock and personal property at public sales in October and November of 1990. Hanson died on March 11, 1991. His probate estate was valued at over $3,000,000.00 based on a substantial investment portfolio, cash and bonds, personal property, and the ranch real estate.

Norwest or the Hanson Estate subsequently commenced a civil suit against Walgamuth in state circuit court seeking recovery of the $263,368.90 in checks made payable to Walgamuth.[6] That action was stayed by Walgamuth's and his wife Karla's filing of a Chapter 7 petition on August 21, 1991. Plaintiff–Hanson Estate filed its dischargeability and constructive trust complaint in bankruptcy on December 16, 1991. Debtors answered the complaint on December 27, 1991 and the matter was set for trial on February 24, 1992.

By a stipulation recited on the record at the commencement of the trial, Chapter 7 Trustee Dennis C. Whetzal and Plaintiff–Hanson Estate agreed that the Hanson Estate would seek a constructive trust only on that property deemed exempt by the Court upon resolution of the objections to Debtors' claimed exemptions filed by Trustee and the Hanson Estate. It was further agreed by the Hanson Estate and Trustee that all other estate property would be administered by Trustee Whetzal for the benefit of all creditors.[7]

Norwest prepared and introduced at trial several documents that summarized its audit of Hanson's records and Walgamuth's records. Each of the ninety-five checks in question was compared with the annual farm journals, Hanson's tax returns and bank statements, and Walgamuth's tax returns and bank statements. Hanson's expenditures for major improvements to the ranch after 1986 were also summarized. Debtors did not generally dispute the accuracy of these documents (Plaintiff's Exhibits 3 and 17 through 23).

Norwest's testimony and exhibits showed that from late 1985 through August, 1990—while Walgamuth played an active role in the ranch's financial transactions—ranch expenses exceeded expenses incurred by Hanson in prior years by an average of $35,000.00 to $40,000.00 per year but there was no corresponding increase in ranch income. These increased expenditures resulted in significant changes to Hanson's ranch and to Walgamuth's financial statement. For example, a large shed—bigger than necessary to house all Hanson's machinery—was constructed at a cost to Hanson of over $20,000.00. Hanson spent another $20,000 plus to remodel the ranch house to accommodate Walgamuth's family. He signed additional checks between 1988 and 1990 for other improvements around the ranch, such as ditch work and gravel.

Much of the increase in the ranch's expenses between 1987 and 1990 was not reflected on Hanson's tax returns nor in the farm journals but was identified by Norwest from the ninety-five checks payable to Walgamuth. Some of these ninety-five checks to Walgamuth, according to the notation on the checks, were for ranch purchases ranging from long horn bulls to a vault. When Norwest compared the deposits from Hanson's account to Walgamuth's account, however, often a corresponding purchase by Walgamuth for the item listed on Hanson's check could not be found or the check to Walgamuth would be notably larger than the cost of the goods or service purchased by Walgamuth for Hanson.

Several of the ninety-five checks had a notation that the funds were for house remodeling or construction costs. When Norwest traced these deposits, it found that Walgamuth purchased different goods or services than that listed on Hanson's checks. Some of these purchases by Walgamuth from Hanson's "remodeling and construction" funds included, among other

---

6. A copy of the state court complaint was not introduced as evidence.

7. Debtors have four secured creditors with claims totaling $82,402.66. These creditors have a security interest in Debtors' home and

three vehicles. Debtors have four unsecured creditors with claims totaling $263,819.38. The Hanson Estate holds 99.8% of the total amount of the unsecured claims. Debtors have no priority creditors.

things, a washer and dryer, a flatbed trailer, an NRA life membership, a mule, some art work, and a Dodge Motor home. Some property that Walgamuth purchased in full or in part with funds from the ninety-five Hanson checks were later used by Walgamuth to trade for other goods. Walgamuth kept some of these goods. Other goods acquired with Hanson funds were later sold by Walgamuth and he retained the proceeds. These transactions involved, among other things, over thirty-five head of cattle, a Bob Cat loader, a WW trailer, and some horses.

The ninety-five checks also included several sizable bonuses for Walgamuth: December 22, 1987, Christmas bonus of $3,000.00; September 29, 1988, cattle bonus of $12,000.00; December 30, 1988, Christmas bonus of $1,000.00; December 24, 1989, Christmas bonus of $500.00; December 24, 1989, Christmas bonus to Walgamuth children of $500.00; July 5, 1990, wage bonus for work on airport deal with Sturgis of $2,500.00; and August 2, 1990, $19,000.00 bonus that Walgamuth said represented $1,000.00 per year for his nineteen years of employment with Hanson. Through these ninety-five checks, Walgamuth also received another $33,791.00 in loans; Walgamuth repaid only a portion of one (a $3,500.00 loan for taxes in 1988). Nineteen of the ninety-five checks made payable to Ronald Walgamuth totalling $30,278.00 had no notation on them; approximately one-half of these nineteen checks were drafted for Hanson's signature and deposited by Walgamuth in 1990. Contemporaneous debits from Walgamuth's account after deposits from Hanson checks for bonuses or loans or on which there was no notation indicate Hanson used these funds for purchases ranging from new vehicles to furniture.

Walgamuth retained some items he purchased with Hanson funds when Walgamuth left the ranch because he said Hanson intended them to be gifts. These items included, among other things, the washer and dryer, tack, a chain saw, a satellite dish, a Yamaha four-wheel bike, a Hydro tractor and a Hydro-swing. The $19,000.00 bonus check was used by Debtors as part of the down payment for their new home in Whitewood.

The Hanson Estate showed that activity in Walgamuth's personal bank account where all ninety-five Hanson checks were deposited increased dramatically after 1986. In 1986, debits totaled approximately $20,194.59 while credits for that year totaled approximately $19,336.50. In subsequent years, these figures swelled: 1987 debits, $45,851.21 and credits, $49,201.49; 1988 debits, $190,340.08 and credits, $188,418.30; 1989 debits, $94,708.80 and credits, $98,236.16; and 1990 debits, $83,569.13 and credits, $63,299.97.

Finally, the Hanson Estate showed that Debtors' personal financial statement changed notably from 1985 to 1991. On January 28, 1985, Debtors completed a financial statement for First Bank of South Dakota that stated they had assets totaling $21,500.00 (including three vehicles and a Honda four-wheel bike plus $10,000.00 in personal property) and liabilities of $15,900.00 (including $14,200.00 in short term loans on the vehicles) resulting in a net worth of $5,600.00. On February 12, 1991, Debtors completed a personal financial statement for First Western Bank that stated Debtors had assets totaling $171,000.00 (including personal property of $20,000.00 and a home valued at $95,000.00) and liabilities of $62,500.00 (their home mortgage) and $38,055.20 (short term loans on five vehicles). Debtors' schedules filed September 11, 1991 indicate assets (exempt and non exempt) totaling $29,241.88 and liabilities of $346,222.04, including the $263,819.38 debt to the Hanson Estate and $60,999.42 for their home mortgage.

Debtors presented testimony and checks written by Walgamuth to argue that some funds from the ninety-five checks paid to Walgamuth from Hanson were used by Walgamuth to pay over $40,000.00 in non reimbursed ranch expenses. Some of Walgamuth's checks had notations on them; Walgamuth testified what the purpose was for his checks that did not have notations. Debtors did not present corroborating receipts or other supporting evidence for these checks.

Walgamuth also argued that all ranch expenditures were incurred at Hanson's direction. He said that Hanson often had him execute checks to Walgamuth on Hanson's accounts that exceeded the price of the good or service Walgamuth was to purchase for the ranch. He said Hanson intended the extra funds to be supplemental compensation for Walgamuth for the additional work he performed in purchasing the good or service for the ranch. Walgamuth also testified that occasionally Hanson would give him a check with a fabricated notation that had little, if anything, to do with the actual purpose for which Walgamuth was to use the funds. He stated Hanson directed him not to include these ninety-five expenditures in the farm journal ledgers.

Walgamuth testified Hanson was an honest person. He could not explain why Hanson would fabricate the purpose of checks or not include expenses paid to Walgamuth in the farm journals. Walgamuth also could not explain why Hanson suddenly and substantially increased ranch expenses and made significant capital improvements to the ranch when Hanson had no realistic possibility of returning to the ranch and continuing its operation himself and where Hanson apparently had not taken any legal steps to insure the continuation of the ranch by Walgamuth or Hanson's family after his death.

Subsequent to the trial on the dischargeability and constructive trust complaint, the parties agreed that the Hanson Estate would seek imposition of a constructive trust only on Debtors' present home to the extent of the $19,000.00 "bonus" check from Hanson dated August 2, 1990 that Debtors used to purchase their Whitewood, South Dakota home.[8] The parties also resolved the Hanson Estate's and Trustee's objections to Debtors' exemptions by an agreement entered on the record on July 7, 1992 and approved by the Court by Order entered July 20, 1992. At the Court's direction, Debtors also filed an amended schedule of personal property to include

items that, according to testimony at the trial, were possessed by Debtors but not included in their original schedules. The dischargeability and constructive trust complaint was thereafter taken under advisement.

## B. *Discussion.*

"The nature and extent of [a] debtor's interest in property are determined by state law." *N.S. Garrott & Sons v. Union Planters National Bank (In re N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir.1985). Once that interest is defined under state law, then federal bankruptcy law dictates to what extent that interest is property of the estate pursuant under 11 U.S.C. § 541. *Id.* (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)).

> [W]here, under state law, the debtor's fraud or other wrongful conduct gives rise to a constructive trust, so that the debtor holds only bare title to the property subject to a duty to reconvey to the rightful owner, the estate will generally hold the property subject to the same restrictions.

*Lambert v. Flight Transportation Corp. (In re Flight Transportation Corp. Securities Litigation)*, 730 F.2d 1128, 1136 (8th Cir.1984). Thus, this Court must look initially to state law to determine whether Debtors'—and thus the bankruptcy estate's—interest in certain property is subject to the constructive trust sought by the Hanson Estate. If Debtors hold property that was obtained fraudulently, it is not properly property of the estate. *Flight Transportation Corp.*, 730 F.2d at 1136 (quoting *Nicklaus v. Bank of Russellville*, 336 F.2d 144, 146–47 (8th Cir.1964)).

> A constructive trust is an equitable remedy imposed under circumstances where it would be unfair for the owner of the property to enjoy the beneficial interest and would result in unjust enrichment.... Imposition of a constructive

---

**8.** This agreement was confirmed with counsel for all parties by a teleconference hearing conducted August 27, 1992.

trust under state law upon a debtor's property generally confers on the true owner of the property an equitable interest in the property superior to the trustee's or [debtors'].

*N.S. Garrott & Sons,* 772 F.2d at 467 (citing *In re Quality Holstein Leasing,* 752 F.2d 1009, 1012 (5th Cir.1985)); *Dodge Motor Trucks, Inc. v. First National Bank,* 519 F.2d 578, 582 (8th Cir.1975).

An implied trust is one created by operation of law. S.D.C.L. § 55–1–6. Under S.D.C.L. § 55–1–8,

[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have had it.

South Dakota law allows the court great discretion in this area because S.D.C.L. § 55–1–11 provides that when the implied trust statutes do not apply, a court of equity may declare and establish an implied or constructive trust pursuant to the custom and practice of that court. *See also Rosebud Sioux Tribe v. Strain,* 432 N.W.2d 259, 263 (S.D.1988). Ample South Dakota case law provides guidance to this Court for the imposition of an implied or constructive trust.

■■■■■ The doctrine of constructive trust is remedial and flexible. *Id.* at 264; *Meyer v. Kneip,* 457 N.W.2d 463, 467 (S.D.1990); *Beever v. F.D.I.C. (In re Farmers State Bank),* 289 N.W. 75, 79 (S.D.1939). It is designed to allow courts to prevent unjust enrichment. *Rosebud Sioux Tribe,* 432 N.W.2d at 264; and *Meyer,* 457 N.W.2d at 467. It is created by operation of law and arises at the time of the wrong. *Meyer,* 457 N.W.2d at 467 (citing *Johnson v. Graff,* 23 N.W.2d 166, 168 (S.D.1946)). To impose a trust under S.D.C.L. § 55–1–8, the plaintiff must show by clear and convincing evidence that (1) the constructive trustee gained; (2) that gain was by fraud, accident, mistake, undue influence, violation of a trust, or other wrongful act; (3) the constructive trustee has no superior right to the thing gained; and (4) the party

seeking the constructive trust would have otherwise had the thing gained. *Rosebud Sioux Tribe,* 432 N.W.2d at 264. If a constructive trust is imposed, the constructive trustee has the duty to surrender the property to the rightful owner. *In re National Benefit Assoc.,* 29 N.W.2d 81, 88 (S.D. 1947).

South Dakota law clearly states that Debtors must return property to the Hanson Estate if they acquired that property wrongfully. Thus, if a constructive trust is imposed on certain property held by Debtors, Debtors would not hold any equitable interest in that property. Likewise, the Bankruptcy Estate would not retain any interest in that property. 11 U.S.C. § 541(a).

■■■■ Since the Hanson Estate is seeking the imposition of a constructive trust only on Debtors' homestead to the extent of the $19,000.00 "bonus" check, it is that property on which the Court must apply the four-part test set forth in *Rosebud Sioux Tribe,* 432 N.W.2d at 264. When the four-part test is applied, it is clear that the Hanson Estate is entitled to a constructive trust on Debtors' homestead to the extent of $19,-000.00 where the $19,000.00 "bonus" represents funds surreptitiously obtained from Hanson.

First, Debtors gained from the $19,-000.00 "bonus" by using the funds to obtain a new home after they left the Hanson ranch home following the termination of Walgamuth's employment there.

Second, the $19,000.00 check was obtained wrongfully by Walgamuth. Evidence supports the conclusion that Hanson was not able to conduct his business affairs at the time Walgamuth presented the $19,-000.00 check to Hanson for his signature. Walgamuth was fully aware at that time that guardianship proceedings had been commenced. Hanson previously had never awarded Walgamuth such a large bonus. Moreover, this "$1,000.00 a year" bonus was the apparent final check in a long stream of funds that Walgamuth obtained from Hanson where Walgamuth's actual

use of the money was not always consistent with the notation on the check or, apparently, with Walgamuth's explanation of the check to Hanson. Further, Debtors could not explain why Hanson did not want the ninety-five checks, including the $19,000.00 "bonus", recorded in the annual farm journals. Finally, Debtors could not justify many of Walgamuth's expenditures from Hanson's account as legitimate ranch expenses consistent with how Hanson operated the ranch in the past.

The third part of the test is met because Debtors failed to show that they had a superior right to the $19,000.00 over the Hanson Estate. And fourth, but for Walgamuth's wrongful taking of the $19,000.00, those funds would be lawfully held by the Hanson Estate.

An order will be entered denying the Hanson Estate's dischargeability complaint and granting the Hanson Estate's complaint for the imposition of a constructive trust on Debtors' homestead to the extent of $19,000.00.